Theodore R. BERGSTROM, Plaintiff,

v.

SEARS, ROEBUCK AND CO. and
Cardinal American Corporation,
Defendants.

No. Civil 3–75–248.

United States District Court,
D. Minnesota,
Third Division.

July 17, 1980.

John D. Gould and Douglas J. Williams, Merchant, Gould, Smith, Edell, Welter & Schmidt, P.A., Minneapolis, Minn., for plaintiff.

Jon O. Nelson, Timothy J. Malloy and Mark T. Banner, Allegretti, Newitt, Witcoff

& McAndrews, Chicago, Ill., Charles E. Steffey, Schroeder, Siegfried, Ryan, Vidas, Steffey & Arrett, P.A., Minneapolis, Minn., and Gerald S. Schur, Arnstein, Gluck, Weitzenfeld & Minow, Chicago, Ill. (of counsel for Sears, Roebuck & Co.), for defendants.

## MEMORANDUM AND ORDER INCORPORATING FINDINGS OF FACT AND CONCLUSIONS OF LAW

MacLAUGHLIN, District Judge.

This patent infringement action was initiated by plaintiff in 1975 against defendants Sears, Roebuck and Co. and Cardinal American Corporation. In 1978, after defendants requested a separate trial on the validity of the Bergstrom patent under 35 U.S.C. § 102(b), this Court and the Court of Appeals concluded that the patent was not invalid under that particular statute. *Bergstrom v. Sears, Roebuck and Co.*, 457 F.Supp. 213 (D.Minn.1978), *aff'd*, 599 F.2d 62 (8th Cir. 1979). Prior to trial, Thermograte Enterprises, Inc., a business entity owned by plaintiff and his family and a non-exclusive licensee under the plaintiff's patent, was dismissed as a plaintiff, as were a number of counts which alleged that defendants were liable for unfair competition. Thus, the only remaining theory is one of patent infringement, and the issues before the Court concern the validity of the patent, whether the patent has been infringed and if so, what relief is appropriate. The following memorandum constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

### The Parties

Plaintiff Theodore R. Bergstrom, a St. Paul, Minnesota resident, is the owner of U.S. Design Patent No. 228,728, which relates to the design of a tubular steel fireplace grate. Bergstrom applied for his patent on December 14, 1971, and the patent was issued on October 23, 1973, for a term of fourteen years. Bergstrom's tubular fireplace grate, known as the "Thermograte," functions as both a grate and a heater, as cool air is drawn into the bottom of the tube which is then heated by the fire and expelled from the top of the tube at an elevated temperature.

Defendant Cardinal American Corporation (Cardinal) is a corporation with its principal place of business in Cleveland, Ohio, and was formerly known as Cardinal Production Experts, Inc. Cardinal American Corporation is also the parent corporation of Production Experts, Inc., and the Cardinal Home Products Division. The predecessor of Cardinal American Corporation was also the parent corporation of the Cardinal Foundry & Supply Company, Tel-O-Post, and Wolfe Steel. Cardinal, through its various divisions, began manufacturing and selling a line of tubular fireplace grates known as the Firebird in 1974. The plaintiff has alleged that the Cardinal grate which is known as the Firebird I infringes U.S. Design Patent No. 228,728.

Defendant Sears, Roebuck and Co. (Sears) is a New York corporation which has, since 1975, purchased Firebird I units from Cardinal for resale to consumers. Plaintiff contends that Sears is also liable as an infringer of the Bergstrom patent.

### The Development of the Thermograte

During the late 1960's, Bergstrom was employed as a metallurgical engineer at the 3M Company in St. Paul, Minnesota. Bergstrom had considered the problem of the inefficiency of fireplaces for several years. In late 1969 or early 1970 he bent an electrical conduit into the configuration of the letter "C" and wired this tube to a standard fireplace grate in his basement fireplace. Bergstrom observed and tested this structure and determined that cool air was drawn into the bottom of the tube, was heated by the fire, and was then expelled from the top of the tube at higher temperatures into the room. Subsequently, Bergstrom prepared a sketch of a single bend "C" shape tube design, and ordered ten tubes from a local firm. On or about March 1, 1970, Bergstrom assembled a prototype unit. The prototype was comprised of five bent tubes and utilized a separate steel strap which was attached to the lower portion of the grate in order to prevent the logs from rolling out of the grate. Bergstrom tested the prototype and concluded that it functioned very well.

Although the initial prototype satisfactorily performed the objective of forcing and circulating hot air into the room, Bergstrom was not satisfied with the appearance or design of the grate. In the latter part of March, 1970, Bergstrom prepared two drawings of different tube configurations, ordered the tubes, and constructed two new structures shortly thereafter. After testing these two experimental structures, Bergstrom concluded that they too functioned very well, and that none of the three structures performed any better than another.

Bergstrom chose one of the two designs developed in March and April of 1970 as his preferred design. The design selected was comprised of six tubes fastened together by a top strap and two horizontal bottom straps which ultimately turn into the legs of the grate. The tube itself is bent into the general shape of a "C," yet utilizes three bends. The tube configuration adopted by Bergstrom includes a relatively straight section serving as the top tube, a bend, a back section which slants forward slightly, another bend, a horizontal section, and a bend which tilts upward slightly and which serves as the air intake portion. Later in 1970, Bergstrom determined that his structure should be welded rather than using U-bolts.

As the fireplace in our culture generally serves as an aesthetic focal point of the home, Bergstrom's selection of a design was premised to a substantial extent on the appearance of the tubular grate. Bergstrom's choice of design was also premised in part on functional considerations.

In 1971, Bergstrom began advertising and selling Thermogrates on a mail order basis through Thermograte Enterprises, Inc. on both a wholesale and retail level. The response to Bergstrom's product was generally favorable, and the then unique product generated substantial free publicity during the early 1970's as a result of its perceived newsworthiness. Sales of the Thermograte increased significantly so that in 1974, Bergstrom left his employment at 3M to devote full time to his family mail order business. Ultimately, Bergstrom expanded the variety of tubular fireplace grates available in terms of size and the number of tubes.

### The Development of the Firebird Heating System

In November of 1973, Robert Kearns, Executive Vice President for sales in one of Cardinal's corporate divisions, purportedly learned of the idea of a tubular fireplace grate at a business seminar on new products. After discussions with Donald Boyd, a vice president of manufacturing for the same Cardinal division, Kearns concluded that as Cardinal was in the business of bending pipe, the idea of a tubular fireplace grate seemed to be a natural product for Cardinal to develop, particularly in light of the looming energy shortage. Thereafter, Kearns took some preliminary steps to analyze the competition and the market for such a product. On January 28, 1974, J. Wesley Sroub commenced working for Cardinal as its product development manager. The principal decisions in connection with the development of the Firebird heating system were made collectively by Kearns, Boyd and Sroub.

On December 12, 1973, Kearns wrote a letter to Thermograte Enterprises, Inc., requesting that a Thermograte be sent to him by mail or that information be furnished as to where a Thermograte could be purchased. Kearns' letter [1] noted that the pur-

1. The full text of the letter reads as follows:

December 12, 1973
Thermograte Enterprises
51 Iona Lane
St. Paul, Minnesota 55117
Gentlemen:
Enclosed is an ad that we saw in a trade journal, and since we have a small office with a fire place, and we felt that this might be able to help our heating problem.

If this item comes in sizes, please send us the sizes, and if not, please either send us one or tell us where we can buy one in this area.
Very truly yours,
CARDINAL FOUNDRY &
SUPPLY COMPANY
Robert B. Kearns
Executive Vice President
cm
Enclosure

pose for the purchase was because "we have a small office with a fire place, and we felt that this might be able to help our heating problem." As Kearns later admitted, he had no fireplace in his office, nor did he have a heating problem. After some delay, Cardinal received a Thermograte on January 30, 1974.

Shortly thereafter, on February 9, 1974, Cardinal officials, including Kearns, Boyd and Sroub, attended a new product meeting at Cardinal which dealt for the most part with Cardinal's proposed tubular fireplace grate. At some point prior to February 9, 1974, Sroub and possibly other Cardinal employees had constructed a prototype of a tubular fireplace grate. This prototype was never produced, and the memories of Cardinal officials are curiously incomplete with respect to the existence and design of the prototype, as well as other circumstances surrounding the creation of the Firebird I. At the February 9th meeting, Cardinal officials compared their prototype with the Thermograte and another model known as the Heat-A-Grate. The minutes of this meeting reflect that Cardinal personnel concluded that the Thermograte was the best model on the market. Prior to the meeting, Sroub prepared a chart which contains illustrations and measurements with respect to the Thermograte, Heat-A-Grate, and Cardinal prototype. This chart depicts the Cardinal prototype in an illustration as having a "C" shaped single bend design resembling the Heat-A-Grate, and as having 1½ inch tubes.

At the meeting, Cardinal principals determined that the design of their tubular grate should be changed to utilize 2 inch 15 gauge tubes as opposed to the initial 1½ inch 16 gauge tubing. The change in tubing size led to some delay in production. The standard Thermograte possessed by Cardinal had 1⅞ inch 14 gauge tubing. It was also determined that Cardinal should market the

product in an unassembled condition for cost purposes. Presumably, as the chart prepared for the new product meeting illustrates the Cardinal prototype as a single bend design, this design was also changed at some point by Cardinal to a two bend "C" shaped design more closely resembling the Thermograte. The design of the Cardinal Firebird I was essentially determined by Boyd and Kearns, and was for the most part dictated to designer Sroub, who was responsible for the drawings. Rather than building a new prototype, Cardinal commenced production based on their final drawings.

The end result of this development was a tubular fireplace grate known as the Firebird I, which was sold in an unassembled condition. The Firebird I configuration is strikingly similar to the Thermograte, although the two grates are not in every respect identical. As did Bergstrom, Cardinal eventually expanded its line of fireplace grates into different sizes and these other lines (Firebird II, III and IV) also added different features. The plaintiff has not charged these other Cardinal Firebird grates with infringement. In addition, for the Firebird I model, Cardinal added intensifier caps as an accessory, which consumers could place on the ends of the top tubes for increased air circulation. These end caps are removable, and are included in the Firebird I box along with the other component parts. Blower accessory units which are electrically powered can also be attached to the air intake tubes of the Firebird I, and such accessories can be separately purchased. A similar blower unit is also available for the Thermograte.

From the period April 1, 1974 through December 31, 1979, Cardinal sold a total of 517,776 Firebird I units, less returns. This amounted to over $10 million in sales over this 5 year 8 month period. Beginning in 1975,[2] Sears began to purchase Cardinal's

---

**2.** The initial arrangements between Sears and Cardinal took place shortly before the deadline for Sears' fall 1975 catalog. In the initial ad-

vertisement for the Firebird I which appeared in Sears' fall 1975 catalog, an illustration of the Cardinal Firebird I containing logs was flanked

line of Firebird products, including the Firebird I, on a regular basis, which were sold to consumers in an unassembled condition. Sears purchased a total of 159,893 units from Cardinal commencing in 1975 and ending in 1979. In the opinion of Robert Kearns, a vice president of one of Cardinal's corporate divisions, the Firebird I was probably the most successful new product introduced at Cardinal.

On April 28, 1975, Cardinal filed an application for a design patent on the design of the Firebird I. For nearly four years, Cardinal prosecuted its application for a design patent on the Firebird I in spite of a series of rejections of the application by the Patent Office on the ground that the Firebird I design was obvious in light of the Bergstrom patent. In 1979, Cardinal finally abandoned its patent application. In the proceedings before the Patent Office, Cardinal of course took a position with respect to the patentability of its tubular fireplace grate which is inconsistent with its present arguments concerning the Bergstrom patent.

*The Prior Art*

There are close to 50 patents covering the subject of tubular fireplace grates or heaters, some of which are more than 100 years old. Bergstrom's patent was issued October 23, 1973. The design patent examiner responsible for the Bergstrom application, who has a B.A. degree in fine arts, considered and cited the Livingston patent (U.S. Patent No. 1,030,002), the Holbek patent (U.S. Patent No. 1,608,745) and the Tailleferre patent (French Patent No. 1,004,182) as references. The evidence at trial failed to establish that the patent examiner did not consider other relevant prior art, with the exception of the Holbek brochure.[3]

Both plaintiff's and defendants' experts, in attempting to justify their respective opinions on the issue of obviousness, examined the prior art to determine its influence on the design embodied in the Bergstrom patent. While the parties' experts considered the effect of patents other than and in addition to the patents cited by the design patent examiner, the defendants' expert, William M. Goldsmith, an industrial design consultant, did not assert that any of these other patents which might be relevant in a determination of the validity of the Bergstrom patent were more pertinent or important than the prior art considered by the design patent examiner. It therefore follows that the most pertinent prior art was considered by the Patent Office in its determination with respect to the Bergstrom patent.

The Court has reviewed the prior art and finds it on the whole to have some common characteristics. First, the patents generally depict fireplace grates or heaters which are somewhat cumbersome and ornate in a decorative sense. Second, the patents invariably either have the heater or grate directly built or integrated into the fireplace structure, or infer by their design that the heater or grate is a part of the fireplace structure itself. Third, and somewhat related to the preceding reason, is that the prior art uniformly exhibits grates which occupy the maximum dimensions of the fireplace structure itself. Fourth, while the configurations of the tubing for the patented grates vary significantly, the structures basically use derivatives of a "C" shape, and the tubes generally are shaped so that the logs rest on a floor on the bottom of the "C." Finally, the patented grates function through convective heat principles.

on the right by a profile drawing of a tubular fireplace grate with arrows illustrating the air movement. This illustration is without question a copy of a drawing which appeared in Popular Science magazine illustrating the operation of Bergstrom's Thermograte. Thus, the drawing contained in the Sears catalog which depicted the operation of the tubular grate undeniably amounted to an illustration of the Thermograte, replete with three bends. Sears

explains this rather inauspicious beginning by asserting that a mistake was made by their catalog art department.

3. The Holbeck brochure contains sales information and illustrations on the patented "Holbek Portable Fireplace Furnace." The Holbek patent, as noted, was before the examiner and was cited as a reference. *See* the Court's discussion of this issue, *infra* at 490.

■ Defendants have raised the issue of whether a tubular grate known as the Heat-A-Grate, manufactured by Woodmack Products, Inc., constitutes prior art. There is no documentary proof as to sales or convincing testimony that the Heat-A-Grate unit or any predecessor unit was in public use or on sale prior to December 14, 1970, the statutory bar date for the Bergstrom patent, or even that it was on sale or in public use during 1971. It necessarily follows that the Heat-A-Grate unit does not amount to prior art. *Clark Equipment Co. v. Keller*, 570 F.2d 778, 786–7 (8th Cir.), cert. denied, 439 U.S. 825, 99 S.Ct. 96, 58 L.Ed.2d 118 (1978).

*Contentions of the Parties*

The basic position of the plaintiff in this litigation is that the defendants, through the production and sale of the Firebird I, have infringed U.S. Design Patent No. 228,-728. In lieu of a recovery of actual damages under 35 U.S.C. § 284, plaintiff seeks to recover the profits of both Cardinal and Sears attributable to the sale of the Firebird I, pursuant to 35 U.S.C. § 289. Plaintiff also seeks an award of attorney fees under 35 U.S.C. § 285, and prejudgment interest. Further, Bergstrom also seeks an injunction against the future production or sale of the Firebird I by the defendants.

The defendants have raised a number of arguments with respect to the validity of the patent, infringement, and the recovery of profits. Insofar as the validity of the Bergstrom patent is concerned, defendants argue that the design is obvious under 35 U.S.C. § 103, that the Bergstrom design lacks novelty, that the design is not ornamental, that the design embodied in the Bergstrom patent is dictated solely or primarily by functional considerations, and that the patent is invalid because the product is intended for an obscure use and as such is not entitled to design patent protection. In addition, defendants submit that Bergstrom's inequitable conduct in failing to provide information to the Patent Office while his patent application was pending renders the patent invalid. Defendants also deny that the appearance of the Firebird I is sufficiently similar so as to amount to patent infringement of the Bergstrom patent, should the patent be held valid. Cardinal and Sears also dispute Bergstrom's right to recover the profits attributable to the Firebird I sales. In this regard, defendants submit that Bergstrom is only entitled to profits which resulted from sales which were generated because of the design or ornamental aspects of the fireplace grate, rather than the entire profit for the sale of the article. Moreover, defendants contend that the recovery of Sears' profits would amount to a prohibited double recovery under 35 U.S.C. § 289. Other issues relating to the recovery of profits concern calculation of the defendants' profits and the treatment to be afforded Sears' fixed costs.

*The Validity of the Bergstrom Patent*

■ In order for a design patent to be valid under Title 35, it "must be new, original, ornamental, nonobvious and the result of invention." *Clark Equipment Co. v. Keller*, 570 F.2d 778, 799 (8th Cir.), cert. denied, 439 U.S. 825, 99 S.Ct. 96, 58 L.Ed.2d 118 (1978). This principle stems from 35 U.S.C. § 171, which deals with design patents, and 35 U.S.C. § 103, which precludes patentability of subject matter which is obvious in light of the prior art. 35 U.S.C. § 171 provides:

Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title.

The provisions of this title relating to patents for inventions shall apply to patents for designs, except as otherwise provided.

It is the appearance of the article taken as a whole which must meet the statutory requirements of patentability. *Id.* at 799.

■ Under 35 U.S.C. § 282, a patent "which has survived the scrutiny of the Patent Office carries a presumption of validity, and a party objecting to the validity of a patent bears the burden of establishing invalidity." *Id.* at 794. This presumption of validity is strengthened when the Patent

Office has considered the most important prior art in connection with the patent application. *Centsable Products, Inc. v. Lemelson*, 591 F.2d 400 (7th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979); *Ortho Pharmaceutical Corp. v. American Hospital Supply Corp.*, 534 F.2d 89 (7th Cir. 1976). This "heavy" burden of proof on the party seeking to invalidate a patent is measured in "terms of substantial evidence." *Clark Equipment Co. v. Keller*, 570 F.2d 778, 795 (8th Cir.), *cert. denied*, 439 U.S. 825, 99 S.Ct. 96, 58 L.Ed.2d 118 (1978); *Farmhand, Inc. v. Lahman Mfg. Co.*, 568 F.2d 112 (8th Cir.), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). In contrast, the burden of persuasion imposed on a party seeking to establish fraud or inequitable conduct because of the nondisclosure of information to the Patent Office is to show such fraud by "clear, convincing and substantial evidence." *Clark Equipment Co. v. Keller*, 570 F.2d 778, 790 (8th Cir.), *cert. denied*, 439 U.S. 825, 99 S.Ct. 96, 58 L.Ed.2d 118 (1978).

■■■ Congress has defined the standard for determining whether the subject matter sought to be patented is nonobvious in 35 U.S.C. § 103:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

While the determination of nonobviousness is essentially a legal question, the determination also implicates certain factual considerations:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). In the design patent context, "the requisite level of skill against which comparisons are to be made is that of the ordinary designer who is chargeable with knowledge of the prior art." *J. G. Furniture Co., Inc. v. Litton Business Systems, Inc.*, 436 F.Supp. 380, 384 (S.D.N.Y.1977). Further, as it is the appearance of the patented article that constitutes the contribution to the public, it is the appearance of the article as a whole which must be compared with the prior art. *Schnadig Corp. v. Gaines Mfg. Co., Inc.*, 494 F.2d 383, 387 (6th Cir. 1974).

Expert opinion testimony offered at trial conflicted on the issue of the obviousness of the Bergstrom design, and rather sparse evidence was offered on the factual question of the level of skill of the ordinary designer which was operative in the art at the time Bergstrom developed the Thermograte design. In the view of Andrew Kostanecki, a talented industrial designer who testified on behalf of plaintiff, Bergstrom's design would not have been obvious to a designer who possessed ordinary skill in the art at the time the Thermograte design was created. Kostanecki asserted in his testimony that the Bergstrom design departed dramatically from the prior art in that the design of the Thermograte was a classically simple, modernistic design which would complement any interior style and was the first tubular grate design to be truly portable and independent of the fireplace structure. In the opinion of Kostanecki, the common design theme inherent in the prior art resulted in the tubular grate being directly integrated into the fireplace struc-

ture itself or exhibiting a design which looked as if the grate was incorporated into the fireplace.

Defendants' expert witness, William Goldsmith, also a talented and successful industrial designer, testified that in his personal opinion, the Bergstrom design was obvious in light of the preexisting patents relating to tubular fireplace grates. While Goldsmith complimented Bergstrom's design effort, he asserted that the Bergstrom design was no more than a combination of influences exhibited in various preexisting patented designs insofar as the shape and configuration of the tubes and function of the grate was concerned. It is the defendants' position that the combination of influences in the prior art and Bergstrom's elimination of some aspects of the prior art designs would have been obvious to the ordinary designer at the time the Thermograte was created.

There are significant differences between the Bergstrom design and the prior art. First of all, the appearance of the Thermograte is simple, uncluttered and modernistic, and would appear so not only to the ordinary observer but the designer with average skills. In this respect, the Bergstrom design effort is markedly different from the appearance of the fireplace grates which comprise the prior art, as the designs are both individually and collectively ornate, cumbersome and elaborate. Second, the Court agrees with Kostanecki's assertion that the Bergstrom design is adaptable to different settings, such as modern, rustic or other interiors, and in this respect the Bergstrom design differs dramatically from the prior art. In this regard, it cannot reasonably be contended, for example, that the Holbek design (U.S. Patent No. 1,608,-745) or the Moizard design (French Patent No. 354,485) would complement a variety of styles, particularly a modern decor. Third,

the Bergstrom design embraces the notion that the fireplace grate is truly separable and independent of the fireplace structure, or in the words of Kostanecki, truly portable. While the Holbek design envisions a portable fireplace furnace (the heavy cast iron gate is mounted on rollers according to both the patent claims and the brochure), the design, as exhibited in both the patent and the brochure illustrations, conveys the idea that the fireplace furnace is an integral part of the fireplace structure itself. In this respect, the Holbek design is consistent with the rest of the prior art.

The Bergstrom design, on the other hand, conveys the notion of independence from the fireplace structure. Defendants argue that the concept of portability is an aspect of function rather than design. While the line of demarcation between function and design is a murky one, the Court has concluded that the notion of independence of the grate from the fireplace structure, whether it be characterized as portability or something else, is more an aspect of design. The significant difference between the Bergstrom design and the prior art make it unlikely that the Bergstrom design would have been obvious from the perspective of the ordinary designer at the time of its creation.

Based principally on the significant differences between the Bergstrom design and the prior art, and the absence of persuasive proof[4] that the Bergstrom design would have been obvious to the ordinary designer, the Court has concluded that the defendants have not established that the Bergstrom design would have been obvious to a designer who possessed ordinary skill in the art at the time of its creation. Insofar as the opinion testimony is concerned, it should be noted that Goldsmith, who is far more accomplished than the average designer, expressed his personal opinion that the

4. The defendants offered a number of exhibits which constitute interpretive drawings of various prior art designs and which were prepared by industrial designers who were employed by or associated with Goldsmith. These drawings were prepared after designers had examined the Bergstrom patent, and both the Thermo- grate and Firebird I units. In the view of the Court, while these exhibits are relevant, they are not very persuasive, as the illustrations are to some extent colored by hindsight which results from the prior knowledge of the appearance of the Bergstrom design.

Bergstrom design was obvious, not that designers with ordinary skill in the art would have so concluded. Nor is there sufficient evidence to establish to any degree of certainty what was the level of ordinary skill in the art at the time the Thermograte design was created. These factors militate against a finding of obviousness, as it is the defendants' burden to establish by substantial evidence that the patent is invalid for obviousness.

■■■ Other factors, of varying secondary importance, also influence the Court's conclusion that the Bergstrom design was not obvious. While both the Thermograte and Firebird I were sold on the basis of function, they were both commercially successful products. This commercial success was due principally to the products' performance and the emerging energy shortage during the time the products were marketed. While the commercial success was due primarily to these factors, the Court cannot conclude with any assurance that the design of the products was irrelevant or did not contribute in some manner to the sales success. Moreover, the resemblance [5] between the Thermograte and the Firebird I (or perhaps outright imitation by Cardinal), as well as Cardinal's statements as to the lack of obviousness of the Firebird design in its own patent application,[6] are all relevant to the issue of obviousness. *Lancaster Colony Corp. v. Aldon Accessories, Ltd.*, 506 F.2d 1197, 1200 (2d Cir. 1974); *LaSalle Street Press, Inc. v. McCormick and Henderson, Inc.*, 445 F.2d 84, 88 (7th Cir.

1971); *Sel–O–Rak Corp. v. Henry Hanger and Display Fixture Corp. of America*, 232 F.2d 176 (5th Cir.), *cert. denied,* 352 U.S. 870, 77 S.Ct. 95, 1 L.Ed.2d 76 (1956). All of these factors support the Court's conclusion that the defendants have not established by substantial evidence that a designer with ordinary skills would have concluded at the time Bergstrom created his design that the Bergstrom design was obvious when compared, either individually or on the whole, with the prior art.

■■■ In addition to being nonobvious, in order for a design patent to be valid the design must be new or novel. In *Clark Equipment Co. v. Keller*, 570 F.2d 778, 799 (8th Cir.), *cert. denied,* 439 U.S. 825, 99 S.Ct. 96, 58 L.Ed.2d 118 (1978), the Court of Appeals articulated the operative standard to determine novelty:

> The novelty of a design patent, on the other hand, is tested by determining the impact of the design upon an ordinary observer. A design patent is novel when the "average observer takes the new design for a different, and not a modified already existing design."

*quoting Thabet Mfg. Co. v. Kool Vent Metal Awning Corp.*, 226 F.2d 207, 212 (6th Cir. 1955).

■■■ In the view of the Court, the Bergstrom design, as exhibited by the patent illustrations and the Thermograte, is a modernistic design with some aesthetic appeal. It differs significantly in appearance from the prior art, as the Bergstrom design

---

**5.** For a more complete discussion on the resemblance between the two products, see the Court's discussion with regard to infringement, *infra* at 490 493.

**6.** The defendants throughout this proceeding have continually insisted that any statements made by Cardinal officials in their unsuccessful patent application are irrelevant. The defendants correctly point out that the filing of their own patent application does not constitute an estoppel, nor do any of the statements contained in their application raise plaintiff's design to a patentable level. *Paramount Publix Corp. v. American Tri-ergon Corp.*, 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997 (1935). To go further, however, is to ignore the visible inconsistency between Cardinal's present stance and

prior statements in its own application. Fed.R. Evid. 801(d)(2). While the Court recognizes that it is not uncommon to assume inconsistent legal positions on occasion, for a four year period Cardinal strenuously argued before the Patent Office that its design was not obvious in light of the prior art and even the Bergstrom design. During this same four year period, Cardinal was defending this lawsuit on the basis that the Bergstrom design was obvious and his patent invalid for nearly every conceivable reason. While the weight to be given such an admission is perhaps not compelling, such statements are nonetheless relevant. *See LaSalle Street Press, Inc. v. McCormick and Henderson, Inc.*, 445 F.2d 84 (7th Cir. 1971).

has a modern flavor which conveys a simple yet classic image. The prior art, on the other hand, either collectively or individually, is ornate, and in some instances, ostentatious. Moreover, as previously noted, the prior art designs are either directly incorporated into the fireplace structure or appear to be so, while Bergstrom's design conveys the notion of independence from the fireplace structure. Further, unlike the prior art, the Bergstrom design is compatible with a wide variety of interior styles. In light of these substantial differences, the Court has concluded that the ordinary observer would not determine that the Bergstrom design as a whole was a modification of a preexisting design or designs. Thus, the Bergstrom patent is not invalid for lack of novelty.

The defendants also argue that the tubular fireplace grate is not appropriate subject matter for a design patent because the patented article is intended for an obscure or hidden use. *See, e. g., Williams v. Syracuse & S. R. Co.*, 161 F. 571 (N.D.N.Y. 1908); *Wagner Typewriter Co. v. F. S. Webster Co.*, 144 F. 405 (S.D.N.Y.1906). Even assuming that defendants' contention is a correct statement of law, the argument must be rejected, as it cannot be concluded that the Thermograte or its imitators are intended to be used in a hidden or obscure manner. A multitude of exhibits comprising the sales literature of both Thermograte and Cardinal establish that such units are very visible once they are inserted into the fireplace structure, and even when fuel is in the process of being burned. Moreover, the tubular grates are even more visible when not in actual use. Further, to accept defendants' argument would in effect result in a finding that nearly all the patents comprising the prior art are invalid, a step the Court is not prepared to take. Thus, the Bergstrom patent is not invalid because the subject matter is improper for design patent protection.

The Court has also concluded that the Bergstrom design has sufficient aesthetic appeal to be ornamental for purposes of 35 U.S.C. § 171. In order for a design to be considered ornamental under the patent laws, the design as a whole must be the result of aesthetic skill and produce a pleasing impression on the aesthetic sense of the observer. *Rains v. Cascade Industries, Inc.*, 402 F.2d 241 (3d Cir. 1968); *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694 (2d Cir. 1961).

In the view of the Court, the Bergstrom design is a graceful and modernistic design which has considerable aesthetic appeal insofar as tubular fireplace grates are concerned. The fireplace in the American home has been and continues to be an aesthetic focal point for the home. The fireplace grates marketed by both Bergstrom and Cardinal are designed to occupy space within a central aesthetic point in the home, and to complement the fireplace. While the Bergstrom design is not embellished with decoration, it is a classically simple design, and is not invalid for lack of ornamentality on this ground. *See Lancaster Colony Corp. v. Aldon Accessories, Ltd.*, 506 F.2d 1197, 1199 (2d Cir. 1974). On the whole, the Bergstrom design is attractive and produces sufficient aesthetic appeal to be ornamental. The Court's conclusion is corroborated by the testimony of Cardinal's Robert Kearns, who noted that proposed changes in the Firebird I were rejected because the changes would result in an unsuitable design for Cardinal to market. In this day of great admiration of modern sculptural designs, the Court would particularly find it difficult to hold that the Bergstrom design has no ornamental attractiveness.

Defendants also argue that the patent is invalid because the Bergstrom design is solely or primarily dictated by functional considerations. *See, e. g., Barofsky v. General Electric Corp.*, 396 F.2d 340 (9th Cir. 1968), *cert. denied,* 393 U.S. 1031, 89 S.Ct. 644, 21 L.Ed.2d 575 (1969); *Methode Electronics, Inc. v. Elco Corp.*, 385 F.2d 138 (3d Cir. 1967). In this regard the defendants argue that the diameter and circular nature of the tubes, the use and size of the legs, the spacing between the tubes, the positioning of the top strap, the angle of incline

with respect to the back tube which parallels the slanting back wall of the fireplace, and the upturned lower portion of the air intake tubes are all dictated by considerations which relate to the performance of the grate and the capability of the grate to fit into a fireplace.

The language of the statute itself provides that a design patent is potentially available for any "new, original and ornamental design for an article of manufacture." 35 U.S.C. § 171. Thus, the very language of the statute itself infers that design patent protection is appropriate for articles which perform some utilitarian function. *Lancaster Colony Corp. v. Aldon Accessories, Ltd.*, 506 F.2d 1197 (2d Cir. 1974); *Protex Signal Co. v. Feniger*, 11 F.2d 43 (6th Cir. 1926); *J. G. Furniture Co., Inc. v. Litton Business Systems, Inc.*, 436 F.Supp. 380 (S.D.N.Y.1977). However, design patent protection is not appropriate where the design is dictated primarily by functional considerations, *Barofsky v. General Electric Corp.*, 396 F.2d 340 (9th Cir. 1968), *cert. denied*, 393 U.S. 1031, 89 S.Ct. 644, 21 L.Ed.2d 575 (1969), or solely by functional considerations, *Hygienic Specialties Co. v. H. G. Salzman, Inc.*, 302 F.2d 614 (2d Cir. 1962). Whether the applicable standard is that the design is dictated *solely* or *primarily* by function oriented considerations, the Court has determined that the Bergstrom patent is not invalid for functionality.

The evidence undeniably establishes that there are numerous possible design solutions for tubular fireplace grates which operate on convective heat principles. The vast difference in appearance of the prior art patents support this conclusion, and presumably these prior art designs performed the task of heating as well as the Thermograte. Moreover, Bergstrom's testimony established that his three initial design solutions performed equally well, yet the appearance of these grates differed substantially. Out of these three choices, Bergstrom ultimately selected the design which later became patented on the basis of appearance.

While the existence of certain aspects of Bergstrom's design in some respects is oriented to performance or function, the design itself, either on the whole or its elements, is not solely, predominantly or primarily compelled or dictated by function. Considerations of function may very well dictate the general "C" shape of the tubular fireplace grate. This does not mean that functional objectives invariably dictate the configuration found in the Bergstrom design, or that any tubular fireplace grate operating on convective heat principles will look the same. The very existence of the prior art dispels this notion. Moreover, the size and spacing of the tubes is a variable which, while related to function, can change the appearance of the design substantially. The myriad of alternatives in terms of the appearance of fireplace grate designs, and the variables which exist in terms of the elements which comprise the overall design, compel the conclusion that the Bergstrom patent is not invalid for functionality.

In their final argument with respect to the validity of the patent, the defendants argue that the patent is invalid or unenforceable because of Bergstrom's fraud or inequitable conduct before the Patent Office. More specifically, defendants contend that plaintiff had knowledge of and failed to provide information to the Patent Office regarding the Holbek brochure and information with respect to the Heat-A-Grate. The defendants reason that this failure to disclose information on the part of Bergstrom demonstrates his bad faith, and renders the patent invalid or unenforceable.

The Court has previously found that the Heat-A-Grate fireplace grate did not amount to prior art. Therefore, Bergstrom's failure to disclose information within his knowledge with respect to the Heat-A-Grate could have had no bearing on the issuance of the Bergstrom patent, and thus the patent is not invalid because of this non-disclosure. *Clark Equipment Co. v. Keller*, 570 F.2d 778 (8th Cir.), *cert. denied*, 439 U.S. 825, 99 S.Ct. 96, 58 L.Ed.2d 118 (1978).

In issuing the Bergstrom patent, the patent examiner cited the Holbek patent as a reference. Bergstrom, sometime during 1972, obtained a copy of a brochure on the "Holbek Portable Fireplace Furnace" from Eleanor Wall, a relative of Holbek, who had sent Bergstrom an unsolicited letter. This letter indicated that the Holbek furnace was patented. This brochure describes the operation of the Holbek furnace, and contains two illustrations. The actual Holbek patent claims indicate in two places that the cast iron grate is built on rollers, and can be rolled in and out of the fireplace structure. While the information and illustrations contained in the Holbek brochure may present a more comprehensive depiction of the Holbek grate when coupled with the information and illustrations presented in the Holbek patent, the brochure does not provide pertinent information which has not already been disclosed in the Holbek patent, such as the aspect of portability.

In light of the fact that the Holbek patent was before the patent examiner, and that the patent contains a detailed two page explanation with four distinct illustrations, it is difficult to conclude that the Holbek brochure would have had any impact at all on the issuance of the patent. *Id.* Moreover, defendants have failed to establish any lack of good faith on Bergstrom's part in connection with the non-disclosure. *Schnadig Corp. v. Gaines Mfg. Co., Inc.,* 494 F.2d 383 (6th Cir. 1974). The defendants have therefore failed to establish by clear and convincing evidence that Bergstrom's conduct with respect to his patent application renders the patent invalid or unenforceable.

■ Based on the foregoing reasons, the Court has concluded that the Bergstrom patent is valid and enforceable.[7]

---

7. The defendants have urged the Court to adopt the result and reasoning reached by the United States District Court for the Middle District of Tennessee in *Mick Mechanisms, Inc. v. Sears Roebuck & Co.*, No. 78–3567–NA–CV (M.D.Tenn., April 29, 1980) wherein the court held a patent for a fireplace grate invalid on a number of grounds. An examination of the *Mick Mechanisms* opinion and the design patent in issue in *Mick Mechanisms* leaves this

## Infringement

■ The test for infringement of a design patent was established by the Supreme Court over a century ago in *Gorham Co. v. White,* 81 U.S. 511, 526–28, 20 L.Ed. 731 (1871):

Plainly, it must be sameness of appearance, and mere difference of lines in the drawing or sketch, a greater or smaller number of lines, or slight variances in configuration, if sufficient to change the effect upon the eye, will not destroy the substantial identity. An engraving which has many lines may present to the eye the same picture, and to the mind the same idea or conception as another with much fewer lines. The design, however, would be the same. So a pattern for a carpet, or a print may be made up of wreaths of flowers arranged in a particular manner. Another carpet may have similar wreaths, arranged in a like manner, so that none but very acute observers could detect a difference. Yet in the wreaths upon one there may be fewer flowers, and the wreaths may be placed at wider distances from each other. Surely in such a case the designs are alike. The same conception was in the mind of the designer, and to that conception he gave expression.

\* \* \* \* \* \*

The purpose of the law must be effected if possible; but, plainly, it cannot be if, while the general appearance of the design is preserved, minor differences of detail in the manner in which the appearance is produced, observable by experts, but not noticed by ordinary observers, by those who buy and use, are sufficient to

Court unpersuaded that the result in this case should be the same. The fireplace grate in issue in *Mick Mechanisms* is simply a regular grate with two straight rods attached to the back of the grate which forms the shape of a "V" for the purpose of holding logs. The patent in suit in *Mick Mechanisms* does not even remotely resemble the prior art in this case or the Bergstrom patent, which is clearly a far superior design effort.

relieve an imitating design from condemnation as an infringement.

We hold, therefore, that if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

Thus, it is unnecessary for the accused product and the patented design to be identical, only that there be substantial identity of appearance from the perspective of the ordinary observer. *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) ("[o]utright and forthright duplication is a dull and very rare type of infringement."). In addition, "the accused device must appropriate the novelty in the patented device which distinguishes it from the prior art." *Sears, Roebuck & Co. v. Talge*, 140 F.2d 395, 396 (8th Cir. 1944).

The Bergstrom design, as depicted in his patent and the Thermograte, and the Firebird I, both illustrated below, are not identical.

Illustrations contained in the Bergstrom patent:

Fig. 1 Fig. 2

Fig. 3

An illustration from Sears' advertising which depicts the Firebird I:

The Thermograte:

The Firebird I:

There are four principal differences in the basic designs of the Bergstrom patent and the Firebird I: 1) the Bergstrom design utilizes six parallel tubes, while the Firebird I has five tubes which are flayed outward so as to not be parallel (although this latter aspect is hardly noticeable); 2) the Bergstrom patent reflects three bends in a profile view, while the Firebird I has two bends; 3) the Firebird I has a metal mesh grate underlying the tubes, while the Thermograte does not; and 4) the Bergstrom design shows a 75° angle cut on the bottom air intake tubes, while the Firebird I has a 90° angle cut on the bottom tubes. In addition, the Firebird I assembly kit included intensifier caps, which can be placed on and removed from the top tubes. The general size of the grate, the diameter and size of the tubes, the appearance of the legs, the placement of the top strap, the color and

the profile view of the Bergstrom design and the Firebird I are very similar.

■ In the view of the Court, there is a substantial identity of appearance between the design embodied in the Bergstrom patent and the Firebird I so as to deceive the ordinary observer, and the Firebird I appropriates the novelty of the patented Bergstrom design. Therefore, the assembled Firebird I infringes the Bergstrom patent. The Court reaches this conclusion for several reasons. First of all, the Firebird design uses the same general proportions as found in the Bergstrom design and appropriates many of the technical aspects, such as the approximate diameter and size of the tubes, shape of the legs, and placement of the top strap. Further, and significantly, the Firebird I design resembles the overall configuration or character of the shape of the Thermograte, as depicted in the patent. In short, there is substantial resemblance. Because of this substantial identity of appearance, the Firebird I appropriates the novelty of the Bergstrom design, as it usurps the modernistic appearance of the Bergstrom design, borrows the notion of independence from the fireplace or portability, and is compatible with various interior styles.

The Court's conclusion that a substantial identity of appearance exists is supported by evidence adduced at trial as well as by a visual inspection. It is noteworthy that a number of Cardinal personnel, according to Wes Sroub, have indicated their viewpoint that the Firebird I and the Thermograte were similar in appearance. This opinion may have been shared by the Patent Office as well, which found that Cardinal's design on the Firebird I was clearly disclosed by and obvious in light of the Bergstrom patent. Further, even defendants' expert conceded that the Firebird I bore the closest resemblance to the Thermograte out of all

the prior art. Moreover, unsolicited letters addressed to Bergstrom and authored by fireplace grate purchasers were admitted into evidence [8] which tend to show some confusion on the part of the purchasers between the Thermograte and the Firebird I. Furthermore, the circumstances leading up to the development of the design of the Firebird I infer that Cardinal officials borrowed heavily from Bergstrom's design. All of these factors support the Court's conclusion that the Firebird I infringes the Bergstrom patent.

Defendants also submit that the use of the intensifier caps or the heat disperser units on the Firebird I should result in a finding of non-infringement. Since May of 1975, intensifier or end caps have been included as an unassembled part of the Firebird I. These intensifier caps fit over the top tubes of the Firebird, unlike the Thermograte or the Bergstrom patent. Further, for every two Firebird I kits which were sold, approximately one heat disperser unit was also sold. These disperser or blower units were sold separately, and were not part of the Firebird I assembly kit. These electrically powered disperser units conceal the front of the bottom line of tubes, and are readily detachable and removable from the assembled Firebird I.

The Court does not agree that the appearance of the Firebird I is altered to the extent that it is non-infringing by the addition of the removable intensifier caps, nor does the Court agree that the number of infringing Firebird I grates should be reduced by the number of disperser or blower units sold. While it is reasonable to infer that those consumers who purchased disperser units actually use the disperser units in conjunction with their assembled Firebird I grates, thereby altering the appearance of

---

8. These letters were admitted over defendants' objections on the basis that the statements contained in the letters amounted to circumstantial evidence of the state of mind of the declarant, and thus were not hearsay, or alternatively, were admissible under Fed.R.Evid. 803(3). *See Programmed Tax Systems, Inc. v. Raytheon Co.*, 439 F.Supp. 1128 (S.D.N.Y. 1977); *Zippo Mfg. Co. v. Rogers Imports, Inc.*,

216 F.Supp. 670 (S.D.N.Y.1963). The letters, on the whole, tend to exhibit a degree of confusion in the minds of the authors over the Thermograte and the Firebird I. However, while the letters tend in a general way to support the Court's conclusion on infringement, the Court has placed little weight on the letters, and they are not a significant factor in the Court's conclusion.

the grate, it is not reasonable to assume that the user leaves the disperser unit continually attached. In light of its separate packaging and sales, and the ability to easily detach the unit from the assembled Firebird, the Court cannot conclude that the user invariably leaves the disperser unit attached. Once the disperser is removed, the appearance of the Firebird I infringes the Bergstrom patent.

▮ As noted previously, the Firebird I was sold unassembled by both defendants. 35 U.S.C. § 271, which deals with the subject of infringement, provides in part as follows:

(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, [directly] infringes the patent.

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

It is well settled that there can be "no contributory infringement without the fact or intention of a direct infringement." *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 526, 92 S.Ct. 1700, 1706, 32 L.Ed.2d 273 (1972); *Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc.*, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961). Under 35 U.S.C. § 271(b), active inducement means "that one has caused or aided and abetted another to infringe a patent." *Ingersoll-Rand Co. v. Rockwell International Corp.*, 420 F.Supp. 277, 281 (S.D.Fla.1976). This particular provision, like 35 U.S.C. § 271(c), is a species of contributory infringement.

▮ Defendants argue that as there can be no infringement until the Firebird I units are assembled, and that there is no proof of assembly of the some 689,000 units in issue here, there is insufficient proof of infringement. The Court finds this argument to have little merit. The consumers who purchase the unassembled Firebird I grates presumably intend to assemble the grates so that the units are functional. Cardinal sells the grates on that basis, and it seems perfectly reasonable to infer that the Firebird I units which have been sold have also been assembled, which results in a direct infringement of the Bergstrom patent. Therefore, defendants are liable for infringement under 35 U.S.C. § 271(b) and (c).

*Recovery of Profits for Infringement of a Design Patent*

▮ In addition to injunctive relief, a design patentee has a number of alternatives with respect to the recovery of damages. Both design and utility patentees may recover damages under 35 U.S.C. § 284, which provides:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

However, unlike a utility patentee, the owner of a design patent possesses an additional remedy available under 35 U.S.C. § 289, which states as follows:

Additional remedy for infringement of design patent

Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.

Nothing in this section shall prevent, lessen, or impeach any other remedy which an owner of an infringed patent has under the provisions of this title, but he shall not twice recover the profit made from the infringement.

A design patentee cannot recover both damages under 35 U.S.C. § 284 and the profits of the infringer under 35 U.S.C. § 289. *Henry Hanger & Display Fixture Corp. of America v. Sel-O-Rak Corp.*, 270 F.2d 635 (5th Cir. 1959). Before Congress revised the statutory scheme regarding the recovery of profits and damages by utility patentees in 1946, utility patentees could recover the profits of infringers as well. Congress, however, chose to leave the law with respect to recovery of profits by design patentees intact.

Plaintiff Bergstrom, rather than attempting to prove damages under 35 U.S.C. § 284, has opted to recover the profits made by Cardinal and Sears from sales of the Firebird I.[9] Beginning on April 1, 1974, through the period ending December 31, 1979, Cardinal's after tax profits resulting from sales of the Firebird I amounted to $1,071,190.00,[10] if attorneys' fees incurred in defending this suit are not allowed as a deduction. The plaintiff, without allowing a deduction from gross revenue for any overhead or fixed costs, calculates Sears' after tax profits on the sale of the Firebird I to amount to a total of $725,163.00. Sears, however, argues that as it is so large that the net profitability for a specific product is impossible to precisely calculate, the only realistic formula to determine its profit on the sales of the Firebird I is to apply the net profit percentage on Sears' merchandising activities to the sales of the Firebird I to arrive at a figure which represents the net profit derived by Sears from sales of the Firebird I. Using this method, Sears contends its total after tax profit for fiscal years 1975, 1976, 1977, 1978, and through December 31, 1979, prior to a deduction for profit sharing, amounts to $169,183.63. Counsel for the plaintiff have,

9. Defendants have raised the argument that the plaintiff is not entitled to recover any profits earned prior to the date this suit was instituted because plaintiff failed to give the required notice of patent infringement under 35 U.S.C. § 287. That section provides:

> Patentees, and persons making or selling any patented article for or under them, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

The record at trial reveals that Bergstrom regularly marked the Thermogrates with hang tags which identify the grate as being patented and gives the patent number. Thus, the giving of notice is not required under the statute. *Munger v. Perlman Rim Corp.*, 244 F. 799 (S.D.N.Y. 1917), *modified and affirmed*, 275 F. 21 (2d Cir.), *cert. denied*, 257 U.S. 645, 42 S.Ct. 54, 66 L.Ed. 413 (1921). Moreover, according to the deposition testimony of Robert Kearns, Cardinal officials were notified that the Thermograte was patented prior to the commencement of production of the Firebird I. Even if some additional notice to the defendants is required, it is clear that Bergstrom notified both defendants of possible infringement at times when the defendants were just beginning to profit from the infringement of the Bergstrom patent. All things considered, defendants' argument lacks merit.

10. The parties do not dispute the amount of Cardinal's profits attributable to the sale of the Firebird I units. An analysis of Cardinal's net profits was performed by an independent accounting firm.

on a number of occasions, indicated to the Court that the plaintiff is not requesting that the profits of Sears and Cardinal be calculated without allowing a deduction for taxes. Therefore, the Court does not consider this issue to be before the Court for resolution, and the discussion which follows assumes the propriety of a deduction for taxes in calculating an infringer's profits. *But see Schnadig Corp. v. Gaines Mfg. Co., Inc.*, 620 F.2d 1166 (6th Cir. 1980) (allowing a design patentee to recover the pre-tax profits of an infringer).

The initial issue raised by defendants involves the statutory construction of the meaning of "total profit" as found in 35 U.S.C. § 289. Defendants argue that a design patentee can only recover profits under 35 U.S.C. § 289 which are attributable to the design or ornamental aspects of the patent, rather than the entire profits on the sale of the patented article. Defend-ants reason that no profits should be awarded because there is no proof that Firebird (or Thermograte) units were purchased for reasons other than function.

■ The Court has determined that the recoverable profit under 35 U.S.C. § 289 should not be diminished by allowing only the profit on sales which resulted from the design of the article. In construing a prior statute allowing design patentees to recover profits from an infringer, the court in *Untermeyer v. Freund*, 58 F. 205, 212 (2d Cir. 1893) observed:

> The manifest purpose of congress was to enlarge the remedy against infringers of design patents, and to declare that the measure of profits recoverable on account of the infringement should be considered to be the total net profits upon the whole article. A construction which should limit a recovery above $250 to the amount which the complainant could clearly establish to be the value which the design had contributed to the infringing carpets would be at variance, not only with the apparent legislative intent, but with the language of the statute. The rule which congress declared for the computation of profits was the total profit from the man-ufacture or sale of the article to which the design was applied, as distinguished from the pre-existing rule of the profit which could be proved to be attributable to the design.

The very language used in the statute, "total profit," undermines defendants' arguments, as it is unlikely that Congress would have used such all encompassing language if it intended that a design patentee could only recover profits attributable solely to the design or ornamental qualities of the patented article.

■ Plaintiff Bergstrom is therefore entitled to recover the total profit made by Cardinal as a result of the sales of the Firebird I. As this five year litigation included four counts of unfair competition which were voluntarily dismissed by plaintiff with prejudice just before trial, the Court has determined that legal fees incurred in defending the dismissed aspects of this litigation should be allowed as a deduction from Cardinal's profits. Conversely, those legal fees incurred by Cardinal which are attributable to the patent infringement aspects of this litigation should not be deductible as a legitimate expense in determining Cardinal's net profit from the sales of the Firebird I. The legal fees incurred by Cardinal for this litigation through December 31, 1979, amount to a total of $15,-141.00. The Court has determined that one half of this amount may be used as a deductible expense in calculating Cardinal's net profit. Plaintiff Bergstrom, as a result of Cardinal's infringement of U.S. Design Patent No. 228,728, is therefore entitled to recover the sum of $1,063,619.50 from Cardinal, which represents the total after tax profit realized by Cardinal as a result of the sales of the infringing Firebird I.

Sears argues that if a design patentee recovers the entire profit made by the manufacturer of an infringing product, the design patentee may not recover profits realized by a purchaser of the infringing product, such as a retailer, who later resells the infringing product. According to Sears, the recovery of profits from a retailer as well as profits of the producer of the infringing

product would amount to an impermissible double recovery. Sears bases its argument on language in the statute, 35 U.S.C. § 289, which notes that the patentee "shall not twice recover the profit made from the infringement."

■ The issue presented is apparently one of first impression under 35 U.S.C. § 289. Based on the statutory language, the purposes underlying the statute, and the pre-1946 case law on the subject of recovery of profits by utility patentees, the Court has concluded that a design patentee can recover the profits of not only the manufacturer or producer of an infringing article, but also the profits of other sellers in the chain of distribution. Thus, the plaintiff is entitled to recover the profits realized by Sears on the sale of the infringing Firebird I's.

■ The statute in question provides, in unmistakable terms, that the infringer of a design patent "shall be liable to the owner to the extent of his total profit . . . ." 35 U.S.C. § 289. In a separate paragraph of this provision, Congress declared that "[n]othing in this section shall . . . lessen . . . any other remedy" available to a design patentee "but he shall not twice recover the profit made from the infringement." In the view of the Court, the purpose of this latter phrase is to insure that a patentee not recover both the profit of an infringer and some additional damage remedy from the same infringer, such as a reasonable royalty. *See Henry Hanger & Display Fixture Corp. of America v. Sel–O–Rak Corp.*, 270 F.2d 635 (5th Cir. 1959). The "shall not twice recover the profit" language should not be taken out of context to preclude recovery of financial gains made by a separate infringer, whose only nexus with the manufacturer is by virtue of a sales contract. Here, both Cardinal and Sears are entities independent of one another, and have each financially benefitted in varying degrees by infringing the Bergstrom patent. *See Dowagiac Mfg. Co. v. Deere & Webber Co.*, 284 F. 331, 340–41 (8th Cir. 1922). Under the statute, the design patentee is entitled to the "total prof-

it" of "[w]hoever" infringes the design. As both Sears and Cardinal amount to infringers, and as both defendants independently benefitted from the infringement, the statutory language compels the conclusion reached by the Court.

■ In addition, the purposes underlying this remedial statute are furthered by the Court's interpretation of 35 U.S.C. § 289. The purpose of the statute "is to place the patentee in the shoes of the infringer." *Schnadig Corp. v. Gaines Mfg. Co., Inc.*, 620 F.2d 1166, 1171 (6th Cir. 1980). To prevent unjust enrichment, the "guiding principle" under the statute is "that the patentee recover every dollar of advantage realized by the infringer from the infringement. . . . " *Id.*, at 1175, *quoting Levin Bros. v. Davis Mfg. Co.*, 72 F.2d 163, 165 (8th Cir. 1934). This principle is hardly furthered by allowing a retailer of infringing products manufactured by another to escape liability altogether and retain its unlawful gains simply because the producer of the infringing article has been stripped of its profits. *See Dowagiac Mfg. Co. v. Deere & Webber Co.*, 284 F. 331 (8th Cir. 1922). Although on some occasions the recovery of profits from both a manufacturer and retailer might result in a windfall to the patentee, Congress has chosen to prevent the unjust enrichment of infringers, and this overriding purpose is furthered by allowing the injured patentee to recover profits from the producer of the infringing article as well as the other sellers in the chain of distribution.

■ As noted, prior to 1946, both design and utility patentees could recover profits from an infringer. *Schnadig Corp. v. Gaines Mfg. Co., Inc.*, 620 F.2d 1166 (6th Cir. 1980). In 1946, Congress revised the law with respect to utility patents to eliminate the recovery of profits, in order to restrict the patentee's recovery to damages alone. *See Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc.*, 377 U.S. 476, 504–07, 84 S.Ct. 1526, 1541–1543, 12 L.Ed.2d 457 (1964). For whatever reason, Congress left the law with respect to the right to recover profits by design patentees un-

changed. Thus, the pre-1946 case law on the subject of recovery of profits by utility patentees should be given substantial weight in the design patent context. In *Dowagiac Mfg. Co. v. Deere & Webber Co.*, 284 F. 331 (8th Cir. 1922), the Court of Appeals held that the recovery of the profits of a manufacturer by the owner of a patent on a grain drill did not preclude the recovery of profits realized by a jobber, who had resold the patented article. In reaching this conclusion, the *Dowagiac* court stated:

> the satisfaction of judgment for the profits of a manufacturer will not free the article in the hands of the user and jobber from all claims of the patentee. The fact that there was a recovery against the manufacturer for profits in making the article complained of as an infringement does not prevent the patentee from proceeding against the manufacturer's vendee for an accounting, if he had made profit, or for damages, or for an injunction.

*Id.* at 335. *Cf. Sammons v. Colonial Press,* 126 F.2d 341, 346 (1st Cir. 1942) (same rule applies in copyright infringement actions). As in *Dowagiac,* the plaintiff should not be precluded from recovering the profits of an infringer other than the manufacturer.

As noted previously, the parties dispute the appropriate method by which to calculate Sears' net profit on the sales of the Firebird I, and consequently, the amount of profit. In plaintiff's proposed method, no deduction is provided for any of Sears' fixed costs, such as administrative expenses, salaries, and other overhead expenditures. Sears' proposed method is to apply the percentage of profit on all of its merchandising operations to the figure which represents the total sales of the Firebird I in order to determine the net profit for this particular product. This latter method, while it includes all the conceivable costs of running a vast enterprise such as Sears, is less than reliable because it includes in its formula not only exceedingly successful products, but also unsuccessful products which Sears may have sustained considerable losses on as a result of the inferiority of the product or other reasons. Moreover, Sears' proposed formula includes costs which have little or no nexus to the actual sales expenditures incurred by Sears in marketing the Firebird I.

 There is no litmus test with respect to the treatment of overhead or fixed costs in a determination of the net profit made as a result of patent infringement, and the allowance or extent of the use of fixed expenses to offset profits is essentially within the discretion of the district court. *Schnadig Corp. v. Gaines Mfg. Co., Inc.,* 620 F.2d 1166, 1174 (6th Cir. 1980); *Levin Bros. v. Davis Mfg. Co.,* 72 F.2d 163 (8th Cir. 1934). The relationship between the particular fixed expenses which are sought to be deducted and the production or sale of the infringing product is a central factor in determining the propriety of this deduction and the amount thereof. *Schnadig Corp. v. Gaines Mfg. Co., Inc.,* 620 F.2d 1166 (6th Cir. 1980). The burden of establishing the nature and amount of these costs, as well as their relationship to the infringing product, is on the defendants. *Henry Hanger & Display Fixture Corp. of America v. Sel-O-Rak Corp.,* 270 F.2d 635, 643 (5th Cir. 1959).

 The proposed profit formula advocated by plaintiff allows deductions for freight costs and handling costs incurred in connection with the Firebird I, and defendants do not dispute the propriety or the amounts of these deductions. As noted, plaintiff's formula results in an after tax net profit figure of $725,163.00, while defendants' formula results in an after tax net profit figure of $169,183.00.[11] The difference between these two figures amounts to $555,980.00, which in effect represents the total of fixed expenses which Sears alleges are allocable to the sales of the Firebird I. These fixed expenses, according to the testimony of Charles Thill, a buyer

---

11. The Court has concluded that Sears is not entitled to deduct the amount payable under Sears' profit sharing plan, as such a deduction is inconsistent with the purposes underlying 35 U.S.C. § 289. *Schnadig Corp. v. Gaines Mfg. Co., Inc.,* 620 F.2d 1166 (6th Cir. 1980).

for Sears, would include administrative, sales and clerical salaries, computer expense, catalog production expenditures, advertising expense and general physical plant overhead. According to Thill, the Firebird I was, since 1975, of probably average profitability when compared with other Sears' products.

The Court has concluded that it would be economically unrealistic to calculate Sears' net profit without an allowance, to some extent, for the fixed expenses incurred by Sears which are outlined above. On the other hand, it is unfair and unreasonable to include, as a part of the allowance, expenditures which have little or no nexus with the sale of the Firebird I. Thus, the net profit formulas of both plaintiff and Sears, in the view of the Court, are deficient.

In *Schnadig Corp. v. Gaines Mfg. Co., Inc.*, 620 F.2d 1166 (6th Cir. 1980), the Sixth Circuit Court of Appeals upheld a district court's award which allowed a manufacturer defendant to deduct ⅔ of its fixed expenses to arrive at the net profit for the sales of an article which infringed the plaintiff's design patent. The *Schnadig* Court pointed out that the inclusion of all overhead may be very unfair to the patentee where the infringer with an established business simply adds a new product which neither causes nor increases the cost of doing business. In light of Sears' size and the established character of Sears' business, and due to the fact that Sears has not incurred the considerable costs of production of the infringing article but has simply purchased the Firebird I units for resale, this is a very real concern. On the other hand, it would be unrealistic to ignore the costs of salaries, overhead and the like, as these expenditures "are necessary for each component of production." *Id.*, at 1172. Many of the items which represent the fixed expenses have no connection with the Firebird I, and some aspects of these expenditures have a remote nexus at best with sales of the Firebird I. Furthermore, as noted previously, Sears' formula is in some respects unreliable as its percentage of profit for Sears' entire mer-

chandising operation is diminished by products less successful than the Firebird I. In light of these factors, the Court has concluded that it would be reasonable to allow Sears 60% of the claimed fixed expenses, or $333,588.00 ($555,980.00 × 60%), as a deduction to determine the net profits on the Firebird I. Thus, plaintiff Bergstrom, as a result of Sears' infringement of U.S. Design Patent No. 228,728, is entitled to recover the sum of $391.575.00 ($725,163.00—$333,-588.00) from defendant Sears, which represents the total after tax profit realized by Sears as a result of the sales of the infringing Firebird I.

In addition, the plaintiff is entitled to injunctive relief under 35 U.S.C. § 283 to prevent further infringement. The Court has also determined that this is not an "exceptional" case within the meaning of 35 U.S.C. § 285, and thus attorneys' fees will not be awarded. Moreover, the Court, in its discretion, has determined that no prejudgment interest should be awarded.

Accordingly,

IT IS HEREBY ORDERED AND ADJUDGED that

1. United States Design Patent No. 228,728 is valid.

2. Defendant Cardinal American Corporation has infringed U.S. Design Patent No. 228,728 by the manufacture and sale of Firebird I fireplace grates.

3. Defendant Sears, Roebuck & Co. has infringed U.S. Design Patent No. 228,728 by the sale of Firebird I fireplace grates.

4. Defendant Cardinal American Corporation, its officers, agents, servants, employees, and all acting under or through it, directly or indirectly, for the remainder of the term of U.S. Design Patent No. 228,728, are hereby enjoined from directly or indirectly, making, or causing to be made, selling, or causing to be sold, using, or causing to be used, fireplace grates of the design of the Firebird I model.

5. Defendant Sears, Roebuck & Co., its officers, agents, servants, employees, and all acting under or through it, directly or indirectly, for the remainder of the term of U.S. Design Patent 228,728, are hereby en-

joined from directly or indirectly, making, or causing to be made, selling, or causing to be sold, using, or causing to be used, fireplace grates of the design of the Firebird I model.

6. Plaintiff is entitled to a judgment against Cardinal American Corporation in the amount of One Million Sixty-Three Thousand Six Hundred Nineteen and 50/100ths Dollars ($1,063,619.50).

7. Plaintiff is entitled to a judgment against Sears, Roebuck & Co. in the amount of Three Hundred Ninety-One Thousand Five Hundred Seventy-Five and no/100ths Dollars ($391,575.00).

8. Defendants' counterclaim for a declaratory judgment is dismissed with prejudice.

9. Plaintiff is entitled to a judgment against both defendants for each of their respective profits on the sale of infringing Firebird I fireplace grates sold by them since January 1, 1980, and the Court will amend the judgment accordingly at the appropriate time.

LET JUDGMENT BE ENTERED ACCORDINGLY.