SCHNADIG CORPORATION,
Plaintiff-Appellant,

v.

GAINES MANUFACTURING COMPA-
NY, INC., Defendant-Appellee.

No. 77–1738.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 5, 1979.

Decided May 8, 1980.

Henry T. V. Miller, McDonald, Kuhn,
Smith, Gandy, Miller & Tait, Memphis,

Tenn., John W. Chestnut, Timothy L. Tilton, Chicago, Ill., for plaintiff-appellant.

Roy Keathley, Heiskell, Donelson, Adams, Williams & Kirsch, Memphis, Tenn., Edward A. Haight, Chicago, Ill., for defendant-appellee.

Before CELEBREZZE and ENGEL, Circuit Judges and PECK, Senior Circuit Judge.

ENGEL, Circuit Judge.

In this appeal we are asked to decide whether the infringer of a design patent can use the income taxes and fixed expenses attributable to his infringing activities to reduce the amount of his "total profit" from the infringement which a design patentee can recover under 35 U.S.C. § 289 (1976).

## I. FACTS

Plaintiff Schnadig obtained a design patent on a three piece Spanish motif sectional sofa suite. In *Schnadig Corp. v. Gaines Mfg. Co.*, 494 F.2d 383 (6th Cir. 1974), this court affirmed the district court's findings that Schnadig's patent was valid and infringed by Gaines' production and sale of its "suite 495" sectional sofa. Schnadig elected to recover Gaines' "total profit" on the infringement under 35 U.S.C. § 289 in lieu of actual damages. In determining the amount of the award the district court allowed the defendant to use the income taxes and approximately two-thirds of the fixed costs attributable to the infringing production to offset its profit figure. Schnadig appeals from the damage award, claiming that it is entitled to recover the infringer's pre-tax profits, determined without reduction for fixed costs.

## II. STATUTORY SCHEME

Although the design patent is not as popularly known as its counterparts, the utility patent and the copyright, design patents perform a distinct function in the federal scheme of legal protection for creative works. The design patent has existed since 1842. Act of August 29, 1842, ch. 263 § 3, 5 Stat. 544. The 1842 statute granted a patent to anyone who by "their own industry, genious, efforts, and expense, may have invented or produced any new and original design for a manufacture . . . ." The current design patent statute differs little from its ancestor, providing that a design patent may be obtained by the inventor of "any new, original and ornamental design for an article of manufacture." 35 U.S.C. § 171 (1976).

■■■ By comparison, utility patents protect a different category of invention; they are available for "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof . . . ." 35 U.S.C. § 101 (1976). Copyright affords a different type of protection to "original works of authorship fixed in any tangible medium of expression," a classification which includes the designs of useful articles insofar as the design features "can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article."[1] Both copyrights and design patents can be used in some circumstances to protect the design of useful articles.[2] How-

1. 17 U.S.C. § 102 (Supp.1977) defines the subject matter of copyright to include "pictorial, graphic, and sculptural works." 17 U.S.C. § 101 defines "pictorial, graphic, and sculptural works" to include "works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned." Section 101 goes on to limit the scope of copyright protection for useful articles as follows: "the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial,

graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." Thus, copyright is available to protect only the form of an object, as separated from its function, and if such a separation is not possible, copyright protection is unavailable.

2. Where the design features cannot "be identified separately from" and are not "capable of existing independently of the utilitarian aspects of [an] article" copyright protection is not

ever, copyright protection is more limited in scope than the protection afforded by a design patent.[3]

The design patent resembles the utility patent in its requirement of novelty, and its grant·of a temporary absolute monopoly.[4] Both design and utility patentees also share one measure of recovery for patent infringement, that afforded by 35 U.S.C. § 284 (1976), which provides in pertinent part:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed ·by the court.

However, the design patentee also has an additional remedy for infringement not available to the utility patentee. This remedy is provided by 35 U.S.C. § 289:

### § 289. Additional remedy for infringement of design patent.

Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.

Nothing in this section shall prevent, lessen, or impeach any other remedy which an owner of an infringed patent has under the provisions of this title, but he shall not twice recover the profit made from the infringement.

It is this "additional remedy" which plaintiff Schnadig has elected to pursue.

The meaning of the words "total profit" as they are used in 35 U.S.C. § 289 is a matter of first impression in this circuit; in fact, no court has squarely addressed this issue in a published opinion.[5] Although

. available at all. However, where copyright is available, it is more popular than the design patent largely because copyrights are far easier and less expensive to obtain than design patents. During fiscal year 1975, the Patent and Trademark Office issued 3,600 design patents, and the Copyright Office made 9,600 registrations covering designs for useful articles. Register's testimony, House hearings 1975, p. 1857. While a design patent must represent "a step beyond the prior art," a "distinguishable variation" whether caused by a "copyist's bad eyesight . . . defective musculature or . . a clap of thunder" is enough to support copyright protection. *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 105 (2d Cir. 1951).

**3.** A copyright protects only from copying, it does not confer an absolute monopoly. As Judge Frank explained in *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 103 (2d Cir. 1951): "[I]t is possible to have a plurality of valid copyrights directed to closely identical or even identical works. Moreover, none of them, if independently arrived at without copying, will constitute an infringement of the copyright of the others." An author of a work very similar to a previously copyrighted work will, of course, have a difficult task proving that he was unaware of the earlier work. However, an "inventor" who produces something already patented infringes the patent regardless of his knowledge of its existence. As the court noted in *Alfred Bell*: "The alleged inventor is charge-

able with full knowledge of all the prior art, although in fact he may be utterly ignorant of it. The 'author' is entitled to a copyright if he independently contrived a work completely identical with what went before." *Id.* at 103. The relative limitation of copyright protection was succinctly summarized in *Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954), where the Court wrote: "Unlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea—not the idea itself."

**4.** Although both utility and design patents confer a temporary monopoly on the holder, the duration of the monopoly differs. Utility patents confer a fixed 17 year monopoly, while design patents may afford protection for either three and one-half, seven, or fourteen years, as the applicant elects in his patent application. The patent fee varies with the duration requested. 37 C.F.R. § 1.155(a) (1979).

**5.** The Fifth Circuit was presented with questions similar to those raised here in *Henry Hanger & Display Fixture Corp. v. Sel-O-Rak Corp.*, 270 F.2d 635 (5th Cir. 1959). However, the court based its ruling on the defendant's failure to show with specificity the amount of the fixed expenses and income taxes which were properly allocable to the infringement, rather than on the scope of 35 U.S.C. § 289. The court wrote:

Justice Holmes' observation that "the life of the law has not been logic; it has been experience"[6] may be true, the lack of judicial experience in this area requires resort to the logic of the various possible interpretations of section 289.

## III. THE DEDUCTION OF INCOME TAXES FROM THE AWARD

The statute provides that the infringer of a design patent "shall be liable to the owner to the extent of his total profit." 35 U.S.C. § 289. The district court ruled that the patentee can recover only the infringer's after-tax profit under this section. The court reasoned that "[t]he awarding of defendant's profits on a before tax basis is a harsh penalty, and the usual measure of profits should be after taxes have been calculated."

An award of pre-tax profits may seem harsh because it apparently requires an infringer to pay more in damages than he was able to gain from the infringement. However, this conclusion ignores the ultimate effect of the payment of the award on the infringer's taxes. We must carry the inquiry one step further to appraise the fairness of excluding the amount paid in income taxes from an award of profits.

When an infringer is required to pay damages to a design patentee, the amount so paid is deductible from his income tax.[7] To illustrate, if a company earned a net pre-tax profit of $100 by infringing, paid $50 in tax, and paid the remaining $50 as damages to the patentee, the infringer would have no remaining cash, but would have a $50 tax deduction available to him. At our fictional 50% tax rate, this deduction would be worth $25 to the infringer, and if the deduction is fully utilized it would represent a $25 net overall gain on the infringement. The reciprocal of the infringer's deduction of the award is the patentee's inclusion of the award in his gross income.[8] Retaining our fictional 50% tax rate, the patentee will keep only $25 of the $50 award, paying the other $25 in tax. In that hypothetical, but very realistic, possibility, the infringer nets as much as his victim, and perhaps even more if the dynamics of the money market are considered.

Although the above illustration is true in theory, the actual dollar impact of a damage award on the taxes of either party will naturally depend upon the party's overall tax situation. Tax rates will vary, and offsetting losses could conceivably bar use of the deduction or negate any tax effect of

---

While apportionment of some overhead and general business costs between the infringing and the non-infringing operations of a business enterprise will usually be made, this should not be done unless it is shown that the particular overhead classifications are such that an apportionment is proper. It is not enough merely to say that the overall overhead for income tax purposes was a stated percentage of overall sales. The master's determination that the claim of the defendants to an allowance for overhead was not established was correct. We reach the same conclusion as to taxes without deciding the extent to which taxes of an infringer may be considered in measuring his profits. 270 F.2d at 643.

6. O. W. Holmes, *The Common Law*, 1, (Harvard Univ. Press ed. 1963).

7. I.R.C. § 162. While fines and penalties paid by law are not deductible, amounts paid as damages are deductible. *See* Treas.Reg. 1.162–21, examples (1) and (3).

8. *See generally* I.R.C. § 61. *Hort v. Commissioner*, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 (1941) firmly established the principle that payments which are received as a substitute for an item of ordinary income must be treated as ordinary income. In most tax cases in this area the dispute turns upon whether a recovery is for loss of profits, and thus taxable as ordinary income, or for damages for injury to good will, thus constituting a return of capital and taxable only to the extent that the damages exceed the basis of the property. *See, e. g., Durkee v. Commissioner*, 162 F.2d 184 (6th Cir. 1947); *Raytheon Production Corp. v. Commissioner*, 144 F.2d 110 (1st Cir.), *cert. denied*, 323 U.S. 779, 65 S.Ct. 192, 89 L.Ed. 622 (1944). It is implicit in Schnadig's recovery of Gaines' total profit on the infringement that the damages are in lieu of profits which Schnadig would have earned but for the infringement. The award should therefore constitute ordinary income to Schnadig.

the award.[9] Nonetheless, because a taxpayer can generally utilize a loss during any of the seven years after, or the three years prior to the year the loss was incurred,[10] the vast majority of infringers should be able to utilize the deduction. If the award was based upon the infringer's after-tax profits, this deduction will allow the infringer to reap a net gain from his infringing activity.

These tax consequences of a patent damage award are not a new development. A Treasury Office Decision issued in 1919 provided that:

> [T]he amount which a plaintiff should report as income or a defendant may deduct in the case of an award for damages on account of patent infringement is not affected by the amount of federal taxes which have been paid by the defendant. The amount to be reported or deducted is the total amount awarded by the court.

O.D. 26, 1 C.B. 67 (1919), declared obsolete, Rev.Rul. 72–440. 1972–2 C.B. 649. In *Larson Co. v. Wrigley Co.*, 277 U.S. 97, 48 S.Ct. 449, 72 L.Ed. 800 (1928), the Supreme Court considered this tax effect in determining the amount which could be recovered as profits in a trademark infringement case. Mr. Justice Holmes wrote for the Court:

It would be unjust to charge an infringer with the gross amount of his sales without allowing him for the materials and labor that were necessary to produce the things sold, but it does not follow that he should be allowed what he paid for the chance to do what he knew that he had no right to do. . . . Even if the only relief that the Wrigley Company can get is a deduction from gross income when the amount of its liability is finally determined, the Larson Company will have to pay a tax on the Wrigley profits when it receives them, and in a case of what has been found to have been one of conscious and deliberate wrongdoing, we think it just that the further deduction should not be allowed.

277 U.S. at 100, 48 S.Ct. at 449.

■■ Although the court in *Larson* held that pre-tax profits should be awarded, defendant Gaines urges that the Court limited such a remedy to cases of "conscious and deliberate wrongdoing." The defendant claims that its infringement did not constitute conscious and deliberate wrongdoing, and therefore an award of after-tax profits is justified. Although the district court's findings could well be read as indicating deliberate wrongdoing,[11] such a finding is

---

**9.** Prior to 1969 patentees often were unable to use previous net operating losses which would have offset the damage award. An infringement would in some cases hurt a patentee so much that net operating losses were incurred for the years of infringement. Generally, net operating losses incurred in tax years between 1955 and 1975 could be carried back to the three previous tax years and forward to five tax years following the loss. I.R.C. § 172(b)(1)(B). The 1976 Tax Reform Act extended the years to which most losses could be carried forward to seven years for losses incurred in 1976 and subsequent years. I.R.C. § 172(b)(1)(B), P.L. 94–455 § 806(b), 90 Stat. 1598 (1976). Because actions to recover for patent infringement may take many years, a patentee often received damages too late to utilize the net operating losses which had been caused by the infringement. Congress addressed this problem in the Tax Reform Act of 1969 by enacting I.R.C. § 186. This section essentially allows the gross income received as damages in patent infringement and anti-trust actions to be reduced for tax purposes by any losses attributable to the infringement which were not previously recovered for tax purposes.

**10.** I.R.C. § 172(b)(1)(B). Only those losses incurred after 1975 can be carried forward for seven years; losses incurred prior to 1976 but after 1955 can be carried forward five years.

**11.** We note that even under the standard urged by defendant an award of pre-tax profits would be justified. The district court found that "defendant intentionally copied Schnadig's Model 4000 in making its Model 495," and that "it must be concluded that defendant's copying and infringement were carried out in willful disregard of plaintiff's rights." These findings indicate conscious and deliberate infringement. Defendant's claim that there was no subjective malice would not preclude it from being characterized as a willful infringer for this purpose. In *General Electric v. Sciaky Bros.*, 415 F.2d 1068 (6th Cir. 1969), GE, the infringer, similarly contended that its honest doubts as to the validity of a utility patent precluded it from being a willful infringer. The willfulness issue was triggered in *Sciaky* by the master's finding that

not necessary. The remedy in this case is one prescribed by statute, not one to be drawn from the common law. Section 289 authorizes a design patentee to recover "to the extent of [an infringer's] total profit." The statute makes no distinction between willful and negligent infringers for this purpose, but instead provides a single measure of relief applicable to all cases of design patent infringement. As we have shown, disallowing consideration of the immediate tax consequences to the infringer does not penalize; it merely assures that the profit to the wrongdoer is fully extracted. This in our view fully comports with the congressional intent embodied in the term "total profit." We cannot read *Larson* as limiting the language of the statute to cases of "conscious and deliberate wrongdoing."[12] Instead, we view the court's reference to such wrongdoing more as descriptive of the facts in that case than as limiting the principle involved.

Section 289 is an "additional remedy" for design patentees, and its apparent purpose is to place the patentee in the shoes of the infringer. By recovering an infringer's pre-tax profits, the patentee will in fact be treated as though he had gained the profits from the exploitation of his patent. We find this to be the result intended by the statute, and accordingly, we reverse the district court's ruling that only after-tax profits can be recovered under 35 U.S.C. § 289.

## IV. THE TREATMENT OF FIXED COSTS

The second issue raised on appeal concerns the district court's ruling that a portion of fixed costs may be considered as an expense in computing the total profit which the patentee may recover. The parties are agreed that the expenses which vary directly with productive activity should be deducted in determining total profits, and have stipulated to the amount of these "variable expenses." Expenses which are generally categorized as overhead, such as administrative salaries and utilities, have been broken down by the parties into fixed and variable expenses according to whether the incremental production of Suite 495 actually affected the amount of the expense.

"because of General Electric's wilful and deliberate infringement of Sciaky's patents the damages which General Electric be required to pay to Sciaky shall be increased in the sum of $500,000.00." Affirming the district court's finding of willful infringement, Judge Edwards wrote for the court:

But General Electric in effect contends it was entitled to take the action that it took without being found guilty of "willful infringement" because it had an "honest doubt" about the validity of Sciaky's patents. In this regard it relies particularly upon a patent "clearance" by its own patent department and a long subsequent patent opinion from a private patent firm. . . .

We believe that there are important factors contained in this record which supply a strong factual basis for the Master's and the District Judge's rejection of the "honest doubt" defense. Among these are the following:

. . . . .

2. No outside counsel was consulted on a matter of such great importance as this prior to the decision to infringe.

. . . . .

6. General Electric copied Sciaky's inventions in toto.

7. It waited to do so until Sciaky had achieved considerable commercial success with them and had put General Electric's control department under serious competitive pressure.

415 F.2d at 1073–74 (footnote omitted). The cited factors were also present in this case. In *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99 (2d Cir. 1951), the defendants claimed that their good faith doubt as to the validity of a copyright justified an award of after-tax profits. The court rejected this argument and wrote: "Open and unabashed piracy is not a mark of good faith; and we think the 'claimed invalidity' unjustified." 191 F.2d at 106.

There is no indication in the Court's opinion in *Larson* that "conscious and deliberate wrongdoing" encompasses only cases of subjective malice. The district court's finding that Gaines' copying was intentional and "in willful disregard of plaintiff's rights" is supported by the record and places Gaines' conduct within the sphere of "conscious and deliberate wrongdoing."

12. The Court in *Larson* did not state that conscious and deliberate infringement must invariably be found before pre-tax profits can be awarded, but merely stated that it was "just" to award pre-tax profits in that case where the infringement was conscious and deliberate.

A total of $76,420 in fixed expenses was allocated to the production of Suite 495. The district court determined that only a portion of these expenses should be allowed to offset profits. The effect of the court's ruling was to allow $51,420, or approximately two-thirds of the fixed expenses to be deducted in determining profits.

■ Neither case law nor logic provides a clear rule for the proper treatment of fixed expenses in computing an award of profits. Theoretically a fixed expense is one that does not fluctuate with the volume of business. However, we recognize that the real world of business does not offer pure laboratory conditions which allow a given expense to be so clearly isolated. By definition, the stipulated fixed expenses would have been incurred regardless of whether the incremental infringing production of Suite 495 had been undertaken. Because these expenses were neither caused nor increased by the infringing production, it may be argued that the infringer should not be permitted to avoid the expense by passing it on the patentee. The response to this argument is that these expenses are necessary for each component of production. Suite 495 could not have been produced without expenses for utilities, administrative salaries, building space and the like being incurred. Viewed in this light, the fixed expenses are as necessary to the infringing production as are the variable expenses, and should be similarly treated. The basic truth that no article of manufacture can be profitable in a real sense if it cannot bear its proportionate share of the fixed costs is hardly new. In *The Tremolo Patent*, 90 U.S. 518, 529, 23 L.Ed. 97 (1874), Mr. Justice Strong wrote:

> [I]t is true that the general expenses of their business would have been the same, if instead of buying and selling one hundred organs, they had bought and sold only ninety-nine. But will it be contended that because buying and selling an additional organ involved no increase of the general expenses, the price obtained for that organ above the price paid was all profit? Can any part of the whole number sold be singled out as justly chargeable with all the expenses of the business? Assuredly no.

The ideal approach to resolving the conflicting considerations present here would be to ascertain whether without the infringement the defendant could have employed the facilities which were devoted to the infringing production in a manner which would have covered the fixed costs at issue. If no alternative use were available, the fixed costs sought to be allocated against the profits from the infringement would have been borne by the defendant's existing non-infringing production, and a recovery of those costs would in effect reduce the cost of his other production, resulting in a net gain from the infringement. Although this is a logical approach, we recognize that it will be difficult for the parties to show and the judge to determine what might have been. While the parties here have not directly addressed the question of the potential alternative uses of Gaines' facilities, the record indicates that Gaines' business was quite successful and growing rapidly during the period in question, and that many of the parts which were used to produce Suite 495 were standard items produced by the defendant. Although this does not conclusively show that Gaines had viable alternative uses for the facilities devoted to production of Suite 495, it provides some basis for such an inference to be drawn by the district court.

Although design patent damage cases are scarce, utility patent and copyright cases provide some guidance in the treatment of fixed expenses in an award of profits. Prior to 1946 a utility patentee, like a design patentee today, could recover an infringer's profits.[13] In *Levin Bros. v. Davis Mfg. Co.*,

13.  The 1870 statute provided:

[U]pon a decree being rendered in any such case for an infringement, the *claimant* [complainant] shall be entitled to recover, in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby, and the court shall assess the same or cause the same to be assessed under its direction, and the court shall have the same powers to increase the same in its

72 F.2d 163 (8th Cir. 1934), a utility patent on davenport beds was infringed. The infringing davenports constituted 2% of the infringer's business, and the infringer sought to deduct 2% of his fixed expenses in determining the profits to be awarded. The master disallowed the deduction, allowing only the expenses which varied with the infringing production to reduce the award. The district court adopted the master's finding without discussing this issue. The Eighth Circuit affirmed the lower court, disallowing the use of the fixed expenses, and discussed the problem presented by the fixed expense question in some detail. Although the result in *Levin* would support a reversal of the district court's ruling that two-thirds of the fixed expenses could be used to offset profits in this case, the *Levin* court stopped far short of promulgating any general rule of law concerning fixed expenses. In fact, the court specifically disclaimed such a purpose, writing:

The patent law gives the right to recover all profits from an infringement. "Profit," as so used, is no mysterious phrase. It means simply all financial gains. Such gains are the difference between expenditures made to produce and sell the infringing articles and the receipts therefrom. Obviously, the application of this rule—the ascertainment of such actual profits—will occasion separate accounting and fact problems in each case because items entering into cost or into receipts will differ. Always, however, the task is to see that the patentee recover every dollar of advantage realized by the infringer from the infringement and no more. No fast and hard rules should or can be stated to guide application of this general rule to the infinite variety of fact situations developed in different cases. . . . Because a recurring item, like overhead, is handled a certain way in a given case such is no statement of a rule of law that the same item must be similarly dealt with in all cases. The "rules" contended for by the parties here are not rules of law. They are but illustrations of applications of the above single broad rule to different fact situations.

72 F.2d at 165. (footnote omitted). The court perceived this question as basically one of fact, and stressed the limited standard of review over factual determinations. The court discussed the competing considerations which must be weighed as follows:

It is quite obvious that an inclusion, in all cases, of all overhead would be very unfair to the patentee. The profit on the patented articles is the difference between the cost of producing them and the price received for them. To put into this cost an overhead expense, in nowise caused thereby, would be an improper inclusion. It often happens that overhead expenses are applicable to and should be spread over the entire business but where a business is established and in operation and another line is taken on without increase of overhead expenses it is just to the patentee that the actual situation be applied and none of such overhead be charged as an expense of the added line except as it participated in manufacture or sale of the infringing article. The statutes for the protection of patentees have properly gone quite far to take away from an infringer every vestige of gain through his wrongful act whether such be manifested by actual income or by decrease of expense items.

discretion that are given by this act to increase the damages found by verdicts in actions upon the case. . . .
Act of July 8, 1870, ch. 230 § 55, 16 Stat. 206 (1870). This provision was essentially unchanged by the 1922 revision, Act of February 18, 1922, ch. 58 § 4921, 42 Stat. 392 (1922). In 1946 the statute was changed to read as follows:
[A]nd upon a judgment being rendered in any case for an infringement the complainant shall be entitled to recover general damages which shall be due compensation for making, using, or selling the invention, not less than a reasonable royalty therefor, together with such costs, and interests, as may be fixed by the court.
Act of August 1, 1946, ch. 726, 60 Stat. 778. The current statute was enacted in 1954 and appears at 35 U.S.C. § 284 (1976).

On the other hand, this theory of not allowing overhead where it has not been increased is of narrow application and not to be extended for it is manifest that every item of expense which should properly be included in the manufacture and sale of the infringing article should be so included in ascertaining the real profit thereon.

72 F.2d at 166.

Given the *Levin* court's recognition of these conflicting considerations, it is not surprising that *Levin* has been relied upon as authority both to allow and to disallow the use of fixed expenses to offset an award of profits. *Compare Sheldon v. M.G.M.*, 106 F.2d 45 (2d Cir. 1939), *aff'd on other grounds*, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940), and *Alfred Bell & Co. v. Catalda Fine Arts*, 86 F.Supp. 399 (S.D.N.Y. 1949), *aff'd on other grounds*, 191 F.2d 99 (2d Cir. 1951), (allowing fixed expenses to offset profits) with *Carter Products v. Colgate-Palmolive Co.*, 214 F.Supp. 383 (D.Md. 1963), (disallowing the use of fixed expenses to offset an award of profits).[14] The common thread running through the cases

which have addressed this issue is a grant of considerable discretion to the trial court. Although the proper treatment of fixed expenses can be viewed as a question of law, most courts have perceived the real question to be the relationship between the particular fixed costs and the infringing production in each case, and this has been treated as a question of fact. This was the view expressed by the Supreme Court in *Sheldon v. M.G.M.*, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940). The plaintiffs in *Sheldon* argued that overhead expenses should not have been considered in computing the profits to be awarded for copyright infringement. The Supreme Court wrote simply:

Petitioners also complain of deductions allowed in the computation of the net profits. These contentions involve questions of fact which have been determined below upon the evidence and we find no ground for disturbing the court's conclusions.

309 U.S. at 409, 60 S.Ct. at 688.

Similarly, in the lone case which has considered the fixed expense question in the

**14.** The Sixth Circuit has also cited *Levin* with approval. In *Horvath v. McCord Radiator & Mfg. Co.*, 100 F.2d 326 (6th Cir. 1938), the infringer used a patented machine to produce a standard type of tubing. The novelty of the patented machine was that it could produce this tubing less expensively than other machines. Judge Hamilton wrote:

The manufacture of spiral fin tubing was only an incident to McCord's business and it is clear from the evidence that this did not materially add to its commercial expenses. *Enterprise Railway Equipment Company v. Wine Railway Appliance Company*, 6 Cir., 77 F.2d 159.

In any event, it is impossible to segregate the particular items of commercial expenses to the infringing business and they are not proper deductions from manufacturing gain. *Levin Bros. v. Davis Manufacturing Co.*, 8 Cir., 72 F.2d 163.

There was also deducted in the account in arriving at net profit $52,092 for franchise taxes, corporate expenses, employees' bonuses, executive bonuses, capital stock tax, amortization of machine costs, bad accounts, interest on bonded indebtedness, borrowed money, remodeling, experimental and development expenses, which were apportioned to spiral fin tubing on a basis of gross sales.

There is nothing in the record to show that these particular expenses were incurred in acquiring the infringing machines or in producing their product, and they are not an allowable deduction for the reason stated in the paragraph immediately above.

100 F.2d at 334. However, the court went on to decide the case on a different basis altogether:

This case presents many difficulties. No basis is in the record on which to award Horvath the precise amount of profits to which he is entitled. It is likewise impossible to formulate a decree against McCord as to profits without the hazard of injustice. These handicaps are due to the incomplete state of the evidence as to the savings in cost of manufacture with Horvath's machines.

This case is one for a reasonable royalty under Section 70 of Title 35, United States Code, 35 U.S.C.A. § 70. In fixing damages on a royalty basis against an infringer, the sum allowed should be reasonable and that which would be accepted by a prudent licensee who wished to obtain a license but was not so compelled and a prudent patentee, who wishes to grant a license but was not so compelled.

100 F.2d at 335. The language quoted above concerning fixed expenses is, therefore, dicta.

context of a design patent infringement action, *Henry Hanger & Display Fixture Corp. v. Sel-O-Rak Corp.*, 270 F.2d 635 (5th Cir. 1959), the court found the factual relationship between the infringing production and the claimed expense to be determinative. The court wrote:

> While apportionment of some overhead and general business costs between the infringing and the non-infringing operations of a business enterprise will usually be made, this should not be done unless it is shown that the particular overhead classifications are such that an apportionment is proper. It is not enough merely to say that the overall overhead for income tax purposes was a stated percentage of overall sales. The master's determination that the claim of the defendants to an allowance for overhead was not established was correct.

270 F.2d at 643.

Although a clear-cut rule may be more comforting to litigants, the approach illustrated above is a realistic one. Even where the amount of fixed expenses is stipulated, as here, the relationship of those expenses to the infringing activity may vary considerably. The alternative available uses of the facilities devoted to the infringement must be considered, and these too will vary. The ascertainment of fixed as opposed to variable expenses is itself a largely subjective process, albeit one that is aided by accounting guidelines. All of these factors must be weighed by the district court in each case so that the expenses properly chargeable against the recoverable profits can be ascertained.

The guiding principle must always be, as the *Levin* court noted, "that the patentee recover every dollar of advantage realized by the infringer from the infringement." 72 F.2d at 165. Because of the infinite variety of fact patterns which may arise, we find that a rigid rule dictating the treatment of fixed expenses would hamper rather than aid the lower courts in achieving this result. Instead, the district court must be given room to sift all of the facts before it in determining the appropriate treatment of fixed expenses.

The district court's ruling that approximately two-thirds of the fixed costs allocable to the infringing production may be used to reduce the profit attributable to the infringement is reasonable. There was some evidence from which the court could infer that some or all of the facilities devoted to production of Suite 495 could have been profitably used by Gaines for other production. The court also had before it extensive documentation concerning the nature of the various expenses which were classified as "fixed" by the parties. As we conceive that this is essentially a question of fact, we must apply the clearly erroneous standard of review to these findings. Applying this standard, we affirm the district court with respect to its treatment of the infringer's fixed costs.

## V. THE CORNER TABLE

Although Schnadig's patent only extends to the three upholstered pieces, both Schnadig and Gaines offered a matching corner table which could be purchased as part of the suite. Judge Wellford found that part of the profit on sales of Suite 495 was attributable to the inclusion of the corner table. The court thereupon ruled that "the plaintiff is not entitled to recover all the profits made by the defendant on the manufacture and sale of corner tables, but is entitled to recover to the extent of $15,000 only."

The defendant has not disputed by cross-appeal or otherwise the propriety of Judge Wellford's award of $15,000 as profits on the sale of the corner table, even though it was not specifically covered in Schnadig's design patent. Schnadig in its appeal disputes the award only insofar as it represents a percentage of Gaines' after-tax instead of pre-tax profit on the corner table.

We are unable to tell from the trial court's opinion exactly how the $15,000 award was computed. Accordingly, we remand to the trial judge for a determination of whether the $15,000 damage award represents a pre-tax or post-tax figure. If the

$15,000 figure represents the recoverable profits before the deduction of taxes, then the $15,000 award shall stand; if instead the defendant's taxes were deducted from its allocable profits in computing the award, the amount thereof shall be adjusted so as to delete any diminution for income taxes.

In conclusion, the judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent herewith.