**WILLIAMS ELECTRONICS, INC., a Delaware corporation, Plaintiff,**

v.

**BALLY MANUFACTURING CORPORA-TION, a Delaware corporation, Defendant.**

**No. 82 C 2167.**

United States District Court, N.D. Illinois, E.D.

April 20, 1983.

---

Melvin M. Goldenberg, William T. Rifkin, Thomas C. Elliott, McDougall, Hersh & Scott, Chicago, Ill., Arthur M. Handler, Manuel W. Gottlieb, Golenbock & Barell, New York City, for plaintiff.

Donald L. Welsh, A. Sidney Katz, John F. Flannery, Fitch, Even, Tabin, Flannery & Welsh, Rodney D. Joslin, Anton R. Valukas, Jenner & Block, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

In October of 1981 plaintiff Williams Electronics, Inc. ("Williams") introduced a pinball game called *Hyperball* into the arcade market. *Hyperball* combines many of the features of a traditional pinball game with those of a video game. In *Hyperball*, the player shoots rolling balls at lighted

"lightning bolt" targets in order to prevent the bolts from hitting the player's "energy center." The player can earn extra points by hitting targets along the side of the playing area.

Williams' competitor, defendant Bally Manufacturing Corporation ("Bally"), sent several employees to a trade show where they saw *Hyperball* in action.[1] Impressed, Bally decided to design a *Hyperball*-type game of their own. The result was *Rapid Fire*,[2] which was introduced to the public at a trade show in March of 1982. Bally has marketed *Rapid Fire* in part by making claims concerning its superiority over *Hyperball*.

Williams filed this lawsuit on April 8, 1982, charging Bally with copyright infringement in violation of 17 U.S.C. §§ 106 and 501 (1976), false representations used in connection with the sale of goods in interstate commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976), and engaging in deceptive practices and unfair competition in violation of state law. This court's jurisdiction rests on 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338 (1976).[3] Bally has moved for summary judgment in its favor under Fed.R.Civ.P. 56.

We turn first to Williams' copyright action. On February 4, 1982, Williams applied for and received from the Copyright Office a certificate of registration for its copyright on *Hyperball*. This registration is prima facie evidence of the validity of Williams' copyright. *See* 17 U.S.C. § 410(c)

(1976).[4] Bally does not contend that Williams' copyright is invalid, so the validity of the copyright is a question we need not reach. Rather, we must decide what rights Williams has under the copyright and whether Bally has infringed those rights. In making that determination, both sides agree that the controlling principles of law were stated in *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607 (7th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982).

In *Atari*, the court began its analysis by observing that in that case the parties stipulated to the validity of the copyright and defendant's access to the copyrighted work, so the case turned on the question whether copying could be inferred from the substantial similarity between the copyrighted and the allegedly infringing works. *See* 672 F.2d at 614. The same is true here. In order to determine what similarities were relevant, the court then turned to the question of what aspects of the copyrighted work, a video game, were protected from appropriation by the defendant. *Id.* The court restated a fundamental premise of copyright law, that a copyright only protects a particular expression of an idea, not the idea itself. *See id.* at 615.[5] Accordingly, a game as such is not protected by the copyright laws. *Id.*[6] What is protected is a particular form of a game, and the protection increases as the work in question moves away from a generalized form to-

---

1. The allegations recited in this paragraph are by no means uncontested; Bally has not conceded their truth. We take them as true for present purposes only.

2. *Rapid Fire*'s original name was *Cross Fire*. The name was later changed.

3. On April 16, 1982, the court denied Williams' motion for a temporary restraining order against *Rapid Fire*, and one week later its motion for a preliminary injunction was also denied, on the ground that Williams had not demonstrated a reasonable likelihood of success on the merits.

4. The registration also serves to place the burden of proof on the party attacking the validity of the copyright. *See Flick-Reedy Corp. v. Hydro-Line Mfg. Co.*, 351 F.2d 546, 549 (7th Cir.

1965), *cert. denied*, 383 U.S. 958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1966).

5. *See generally, e.g., Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954); 17 U.S.C. § 102(b) (1976).

6. *See Anti-Monopoly, Inc. v. General Mills Fund Group*, 611 F.2d 296, 300 n. 1 (9th Cir. 1979); *Morrissey v. Proctor & Gamble Co.*, 379 F.2d 675 (1st Cir.1967); *Midway Mfg. Co. v. Bandai-America, Inc.*, 546 F.Supp. 125, 148 (D.N.J.1982); *Midway Mfg. Co. v. Arctic Int'l, Inc.*, 211 U.S.P.Q. 1152, 1157–58 (N.D.Ill.1981), *aff'd*, 704 F.2d 1009 (7th Cir.1983); *In re Coin-Operated Audio Visual Games*, 214 U.S.P.Q. 217, 227 (U.S.Int'l Trade Comm'n 1981).

ward a particularized expression. *See id.* at 615–17. The court wrote,

> Plaintiffs' audiovisual work is primarily an unprotectable game, but ... to at least a limited extent the particular form in which it is expressed (shapes, sizes, colors, sequences, arrangements, and sounds) provides something "new or additional over the idea."

*Atari,* 672 F.2d at 617.[7] Thus, the court accorded copyright protection to specific characters in the video game at issue in *Atari:* the ghost monster and gobbler, as well as the distinctive gobbling action and manner in which the gobbler disappeared upon being captured. *See id.* 617–18.[8] However, the court held that standard game devices, which would be necessary to any game employing the same concept as the plaintiff's game, such as mazes and tunnels, were unprotected. *See id.*[9]

■ *Atari* thus indicates that the fact that Bally may have set out to make a *"Hyperball*-type" game is, in itself, irrelevant. The concept of a game where a player shoots rolling balls at advancing "enemies" is not copyrightable.[10] Moreover, *Atari* indicates that appropriation of a certain "type" of game is not in itself actionable. As one court put it when assessing a game where the player navigates a spaceship through a field of asteroids,

> when plaintiff copyrighted his particular expression of the game, he did not prevent others from using the idea of a game with asteroids. He prevented only

the copying of arbitrary design features that make plaintiff's expression of this idea unique.

*Atari, Inc. v. Amusement World, Inc.,* 547 F.Supp. 222, 227 (D.Md.1981). "[T]he copyright laws preclude appropriation of only those elements of the work that are protected by the copyright." *Atari,* 672 F.2d at 614 (footnote omitted).

■ Applying these principles, it becomes clear that not only is the fact that the two games are of the same general "type" irrelevant, but also a number of other similarities are irrelevant. Any game employing the same idea or concept as *Hyperball* would have to provide a cannon or some other shooting device at the lower end of the playing field, have targets arranged along the side and back of the field, provide rows of some sort of advancing enemy, an area that the player must protect from the advancing enemy, and some system of indicator lights as a means for score to be kept. These elements are common to virtually all pinball and video games, and are necessary if the player is to have a meaningful objective (protecting an area from the advancing enemy and scoring points).

A second set of limitations on the scope of Williams' copyright is suggested by the nature of the copyrighted material. Williams claims that the material can be protected under the Copyright Act because it falls within the ambit of "pictorial, graphic and sculptural works" within the meaning

---

**7.** *See also Midway Mfg. Co. v. Arctic Int'l, Inc.,* 547 F.Supp. 999, 1006, 1009 (N.D.Ill.1982), *aff'd,* 704 F.2d 1009 (7th Cir.1983); *Atari, Inc. v. Amusement World, Inc.,* 547 F.Supp. 222, 226–27 (D.Md.1981); *Midway Mfg. Co. v. Bandai-America, Inc.,* 546 F.Supp. 125, 149 (D.N.J. 1982); *Midway Mfg. Co. v. Dirkschneider,* 543 F.Supp. 466, 480 (D.Neb.1981).

**8.** *Atari*'s analysis also suggest that the game's distinctive music and the cartoon sequence displayed before play is initiated is protected. *Midway Mfg. Co. v. Bandai-America, Inc.,* 546 F.Supp. 125, 151 (D.N.J.1982).

**9.** The maze and scoring table are standard game devices, and the tunnel exits are nothing more than the commonly used "wrap around" concept adapted to a maze-chase

game. Similarly, the use of dots provides a means by which a player's performance can be gauged and rewarded with the appropriate number of points, and by which to inform the player of his or her progress. Given their close connection with the underlying game, [defendant]'s maze design, scoring table, and "dots" are sufficiently different to preclude a finding of infringement on that basis alone. *Id.* at 617.

**10.** *Cf. Affiliated Hosp. Prods., Inc. v. Merdel Game Mfg. Co.,* 513 F.2d 1183, 1188–89 (2d Cir.1975) (rules of game not copyrightable); *Chamberlin v. Uris Sales Corp.,* 150 F.2d 512 (2d Cir.1945) (same); *Seltzer v. Sunbrock,* 22 F.Supp. 621, 630 (S.D.Cal.1938) (same); *Whist Club v. Foster,* 42 F.2d 782 (S.D.N.Y.1929) (same).

of 17 U.S.C. § 102(a)(5) (1976). The Act goes on to define this term.

"Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, gloves, charts, technical drawings, diagrams and models. Such works shall include works of artistic craftsmanship *insofar as their form but not their mechanical or utilitarian aspects are concerned;* the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work *only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.*

17 U.S.C. § 101 (1976) (emphasis supplied).[11]

The emphasized language clearly limits the scope of the copyright protection Williams can receive. Congress intended to exclude from copyright protection the functional elements of a work such as *Hyperball.* The legislative history amplifies this point.

[T]he Committee is seeking to draw as clear a line as possible between copyrightable works of applied art and uncopyrighted works of industrial design. A two-dimensional painting, drawing, or graphic work is still capable of being identified as such when it is printed on or applied to utilitarian articles such as textile fabrics, wallpaper, containers, and the like. The same is true when a statue or carving is used to embellish an industrial

product or, as in the *Mazer* [*v. Stein,* 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954)] case, is incorporated into a product without losing its ability to exist independently as a work of art. On the other hand, although the shape of an industrial product may be aesthetically satisfying and valuable, the Committee's intention is not to offer it copyright protection under the bill. Unless the shape of an automobile, airplane, ladies' dress, food processor, television set, or any other industrial product *contains some element that, physically or conceptually, can be identified as separable from the utilitarian aspects of that article,* the design would not be copyrighted under the bill. The test of separability and independence from "the utilitarian aspects of the article" does not depend upon the nature of the design—that is, even if the appearance of an article is determined by esthetic (as opposed to functional) considerations, only elements, if any, which can be identified separately from the useful article as such are copyrightable. And, even if the three-dimensional design contains some such element (for example, a carving on the back of a chair or a floral relief design on silver flatware), copyright protection would extend only to that element, and would not cover the over-all configuration of the utilitarian article as such.

House Rep. No. 94–1476, 94th Cong., 2d Sess. 55 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5668 (emphasis supplied).[12]

Thus, Williams may only copyright those aspects of *Hyperball* that are separable

---

11. A "'useful article' is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a 'useful article'." *Id.* Williams does not dispute that *Hyperball* is a "useful article" subject to the qualifying language of the statute.

12. The reason for this limitation is that it is thought undesirable to grant monopoly power over utilitarian articles unless the substantial showing of originality required by the patent laws can be made. Congress evidently is more willing to grant monopoly power over non-utili-

tarian articles than over utilitarian ones, the social costs of monopolies with respect to non-utilitarian elements presumably being less than the costs when production of a utilitarian item is removed from the free market. *See generally Mazer v. Stein,* 347 U.S. 201, 214–18, 74 S.Ct. 460, 468–70, 98 L.Ed. 630 (1954); *Baker v. Seldin,* 101 U.S. 99, 25 L.Ed. 841 (1879); *Schnadig Corp. v. Gaines Mfg. Co.,* 620 F.2d 1166, 1167–68 (6th Cir.1980); *Stein v. Export Lamp Co.,* 188 F.2d 611 (7th Cir.), *cert. denied,* 342 U.S. 829, 72 S.Ct. 53, 96 L.Ed. 627 (1951); *Stein v. Benaderet,* 109 F.Supp. 364 (E.D.Mich.1952).

from its utilitarian aspects. In essence, this test means that copyright protects only those elements superfluous to the functional aspects of the article; if the element is a part of the utilitarian aspect of the article the test of separability cannot be satisfied. *See Norris Industries, Inc. v. International Telephone and Telegraph Corp.,* 696 F.2d 918, 923–24 (11th Cir.1983).[13] Some examples may prove helpful. For example, a sculptured belt buckle is copyrightable because the sculptured design has an existence conceptually severable from its function. *See Kieselstein-Cord v. Accessories by Pearl, Inc.,* 632 F.2d 989 (2d Cir.1980). Examples of elements of an article not severable from its utilitarian function include the pattern formed by an automobile wheel cover, *see Norris Industries,* the appearance of display folders for carpet samples, *see Fabrica, Inc. v. El Dorado Corp.,* 697 F.2d 890, 892–94 (9th Cir.1983), the shape of a lighting fixture, *see Esquire, Inc. v. Ringer,* 591 F.2d 796 (D.C.Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979), the design of the face of a watch, *Vacheron & Constantin-LeCoultre Watches, Inc. v. Benrus Watch,* 155 F.Supp. 932, 934–35 (S.D.N.Y.1957), *aff'd in part and rev'd in part on other grounds,* 260 F.2d 637 (2d Cir.1958), the design of a shoe, *see SCOA Industries, Inc. v. Famolare, Inc.,* 192 U.S. P.Q. 216 (S.D.N.Y.1976), a typeface, *see Eltra Corp. v. Ringer,* 579 F.2d 294, 296–98 (4th Cir.1978), and the shape and appearance of a toy airplane, *Gay Toys, Inc. v. Buddy L Corp.,* 216 U.S.P.Q. 766 (E.D.Mich. 1981), *rev'd,* 703 F.2d 970 (6th Cir.1983). Particularly pertinent is *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905 (2d

Cir.1980), where the court held that the shapes and mechanical aspects of games are not copyrightable.

The features of Tomy's games that have been copied by Durham relate solely to the mechanical, utilitarian aspects of the toys. The levers and buttons of the Pass the Nuts game and the steering wheel and moving path of the Drive Yourself Crazy game are the mechanisms that make the games work. The shapes of the toys and their dimensions and configurations also appear to have been dictated primarily by utilitarian considerations.

Tomy has simply failed to specify any "sculptural features" or aesthetic elements of either game which could be identified separately from and exist independently from the utilitarian aspects of the article. In fact, Tomy's games are "sculptures" only in the sense that every three-dimensional object has a shape. Neither game is a sculptural work as defined by the Copyright Act.

*Id.* at 915 (citation omitted).

■ Applying this limitation on copyright protection to the instant case, it is evident that many elements of *Hyperball* are unprotected. The color, shapes and placements of the targets, ball cannon, grip handles, and indicator lights on the targets, the use of lettered targets to assist the player in scoring, and the shape of the speaker and back box are far from functionally superfluous and are physically inseparable from the functional elements of the game.[14] The colors, shapes and locations of these items have no conceptual significance apart from the role they play in

---

13. *See generally Fabrica, Inc. v. El Dorado Corp.,* 697 F.2d 890, 892–94 (9th Cir.1983); *Williams Electronics, Inc. v. Arctic Int'l, Inc.,* 685 F.2d 870, 874–75 (3d Cir.1982); *Kieselstein-Cord v. Accessories by Pearl, Inc.,* 632 F.2d 989 (2d Cir.1980); *Durham Inc. v. Tomy Corp.,* 630 F.2d 905, 913 (2d Cir.1980); *Esquire, Inc. v. Ringer,* 591 F.2d 796, 803–04 (D.C.Cir. 1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979); *Eltra Corp. v. Ringer,* 579 F.2d 294, 296–98 (4th Cir.1978); *Rosenthal v. Stein,* 205 F.2d 633 (9th Cir.1953); *Stein v. Mazer,* 204 F.2d 472 (4th Cir.1953), *aff'd,* 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954); *Gay*

*Toys, Inc. v. Buddy L Corp.,* 216 U.S.P.Q. 766 (E.D.Mich.1981), *rev'd,* 703 F.2d 970 (6th Cir. 1983); *Vermont Castings, Inc. v. Evans Prods. Co.,* 215 U.S.P.Q. 758, 762–63 (D.Vt.1981); *SCOA Ind., Inc. v. Famolare, Inc.,* 192 U.S.P.Q. 216 (S.D.N.Y.1976).

14. "[F]unctional components of useful articles no matter how artistically designed have generally been denied copyright protection unless they are physically separable from the useful article." *Norris Ind., Inc. v. International Tel. & Tel. Corp.,* 696 F.2d 918, 924 (11th Cir.1983).

the mechanical operation of the game.[15] The color, shape and location of the cannons and targets, for example, are neither physically nor conceptually distinct from the cannons and targets themselves, which Williams concedes have utilitarian significance.[16]

Once the noncopyrightable elements of *Hyperball* are put to one side, relatively little remains. The color and shape of the playing field is primarily all that is left. Thus, we must apply *Atari*'s "substantial similarity" test by comparing only the protected elements of *Hyperball* to the analogous elements in *Rapid Fire. See also Atari, Inc. v. Amusement World, Inc.,* 547 F.Supp. 222, 227–28 (D.Md.1981). The substantial similarity test is applied by use of the formula first laid out by Judge Learned Hand. The question is whether, as between the two articles,

> the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.

*Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960).[17] Moreover, because this test involves no more than looking at the two games, it is ideally suited for summary adjudication.

Under the circumstances of this case, the determination of copyright infringement (or lack thereof) is predicated upon an ocular comparison of the works themselves and does not involve any material credibility issues.

*Atari,* 672 F.2d at 614.

In viewing the two games solely with reference to their copyrightable features, one is struck by the almost complete *absence* of substantial similarities.[18] The *Hyperball* playing field contains three columns of thunderbolts. *Rapid Fire* has only two columns of aliens carrying shields which pass ammunition to two guns. Nothing like the aliens, shields, ammunition or guns appears on the *Hyperball* playing field. The thunderbolts and aliens are roughly the same color, but there the similarity ends. *Hyperball*'s thunderbolts point toward an oval area on which the logo "Energy Center" appears. Below that the word "Hyperball" in lighted block letters appears, and below that "Hyperball" is again written in stylized italics. The *Rapid*

**15.** This discussion suggests a distinction in the scope of copyright protection accorded video games, such as the one at issue in *Atari,* and rolling ball games such as *Hyperball.* In a video game, the audiovisual aspects of the game that appear on the screen are conceptually separable from its utilitarian aspects—a computer program and hardware. *See Williams Electronics, Inc. v. Arctic Int'l, Inc.,* 685 F.2d 870, 874–75 (3d Cir.1983) (following *Midway Mfg. Co. v. Arctic Int'l, Inc.,* 547 F.Supp. 999, 1009 (N.D.Ill.1982), aff'd, 704 F.2d 1009 (7th Cir.1983)). *See also Midway Mfg. Co. v. Arctic Int'l, Inc.,* 704 F.2d 1009 at 1009–1102 (7th Cir.1983). In a rolling ball games, many of the audiovisual aspects of the game—the cannon and targets for example—are mechanical devices which have functional significance, rather than merely audiovisual displays generated by some distinct functional element.

**16.** We must also disregard functional similarities between the way the two games operate since the deposit of identifying material with the Copyright Office which accompanied Williams' copyright application must "show clearly the entire copyrightable content," 37 C.F.R. § 202.21(b) (1982), of *Hyperball.* The only material that Williams deposited were photographs of the exterior configuration and artwork of *Hyperball.* Thus, as Williams seems to concede, its copyright claim is limited to the exterior configuration and artwork of *Hyperball.* Because of the irrelevance of the purely functional features of the games, while we have viewed the games themselves, we have relied perhaps more heavily on the photographs of the games with which we have been provided, since the photos contain no irrelevant material, and show only the elements for which copyright protection is claimed.

**17.** The *Peter Pan* test was adopted by the court in *Atari,* 672 F.2d at 614. *See also Atari, Inc. v. Amusement World, Inc.,* 547 F.Supp. 222, 227–28 (D.Md.1981); *Midway Mfg. Co. v. Bandai-America, Inc.,* 546 F.Supp. 125, 147–48 (D.N.J. 1982); *Clarke v. G.A. Kayser & Sons, Inc.,* 472 F.Supp. 481 (W.D.Pa.1979), aff'd mem., 631 F.2d 725 (3d Cir.1980).

**18.** Photographs of *Hyperball* are appended as attachments "A" and "B" hereto. Photographs of *Rapid Fire* are appended as exhibits "C" and "D" hereto. **Editor's Note:** The photographs referred to above and appended to the filed opinion are not sufficiently clear to permit satisfactory reproduction and hence are omitted.

*Fire* playing field contains no oval area but rather variously colored dotted lines that radiate out from a dotted line in the shape of a semicircle, with the words "Force Field" written in a gothic style below the semi-circle. *Hyperball* has several "bombs" arrayed along the side of the playing field, but none of the various colored dotted lines that are on the *Rapid Fire* field.[19] But even more important than these specific dissimilarities is the overall difference in the aesthetic impressions generated by the two games.[20] *Hyperball* displays thunderbolts; the player's adversary is an impersonal natural force represented by geometric figures. *Rapid Fire* displays enemy creatures, humanoid in appearance. The *Rapid Fire* player's enemy is more personalized and not simply a geometric shape.

In sum, there is no substantial similarity between the two games. The similarities are almost wholly the product of the games' reliance on similar but noncopyrightable game concepts. The specific artwork and exterior configuration[21] in which Williams claims a copyright is not substantially similar except in that both games portray an adversary—though the adversaries hardly appear or act the same and the concept of an adversary is hardly copyrightable.[22] Be-

cause there is no substantial similarity between the copyrightable portions of the two games, Bally has not infringed Williams' copyright and is entitled to summary judgment on Williams' copyright claim.

We turn next to Williams' Lanham Act claim. The parties agree that the five elements Williams must demonstrate to succeed on this claim were correctly stated by the court in *Skil Corp. v. Rockwell International Corp.*, 375 F.Supp. 777, 783 (N.D.Ill. 1974). They are (1) in its advertisements, Bally made false statements of fact about its own products;[23] (2) the advertisements actually deceived or had the tendency to deceive a substantial segment of their audience; (3) the deception was material in that it was likely to influence purchasing decisions; (4) Bally caused its falsely advertised goods to enter interstate commerce; and (5) Williams has been injured as a result of the advertisements either by direct diversion of sales from itself to Bally or by lessening of the goodwill its products enjoy with the buying public.

▬ In support of its Lanham Act claim, Williams relies on five specific statements about *Rapid Fire* made in a memo prepared by one of Bally's employees which Williams contends are false.[24] Bally con-

---

**19.** The displays on the games' backboxes are also dissimilar. *Hyperball's* backbox has an upper segment with a picture of a cosmic starburst, and the word "Hyperball" written in stylized italics over it. The lower segment has two intersecting thunderbolts meeting at a circle in which the letters "HB" are found. The upper segment of *Rapid Fire's* backbox displays the game's name, Bally's distinctive logo, and an alien firing a cannon. The lower segment bears another logo, and a picture of a moving ball bearing.

**20.** "When analyzing two works to determine whether they are substantially similar, courts should be careful not to lose sight of the forest for the trees." *Atari,* 672 F.2d at 618 (footnote omitted).

**21.** Williams has not even attempted to argue that the exterior configurations of the games are similar. They are not. The sides of the playing field in *Hyperball* are parallel, in *Rapid Fire* they are not, but instead slope away from the player. *Hyperball's* backbox is one frame, perpendicular to the floor. *Rapid Fire's* is in

two frames at different angles, only one of which is perpendicular to the floor.

**22.** Where artwork on two games is similar only in that both portray common objects likely to appear in any game based on the same idea, there is no infringement. *See Clarke v. G.A. Kayser & Sons, Inc.,* 472 F.Supp. 481 (W.D.Pa. 1979) (both baseball-type games had baseball gloves printed on them), *aff'd mem.,* 631 F.2d 725 (3d Cir.1980).

**23.** The parties agree that only statements about Bally's own products are actionable. *See Bernard Food Ind., Inc. v. Dietene Co.,* 415 F.2d 1279, 1283–84 (7th Cir.1969), *cert. denied,* 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970).

**24.** Bally contends that the memo is not the type of representation covered by the Lanham Act, since it is typewritten, written for internal use, and had a limited circulation. Bally relies on *Marcyan v. Nissen Corp.,* 215 U.S.P.Q. 629, 646 (N.D.Ind.1982), where the court held that statements in a user's manual not distributed to the public to promote sales were not covered by

tends that Williams can produce no evidence that any of the statements are false.

■ The first specific representation that Williams contends is false is the claim that *Rapid Fire*'s hopper unit does not jam and that it is capable of feeding the gun at the rate of ten balls per second. Williams does not cite any study undertaken of the performance of *Rapid Fire,* despite the fact that it has had access to it for some time and has been able to test the hopper unit. In fact, it relies on only two specific claims to support its position. First, it states that several of its employees watched *Rapid Fire* in operation at a trade show and saw it jam several times.[25] This showing is far from adequate to create an issue of fact. Whatever problems Bally had with its machine at a particular trade show may be highly unusual. In a case such as this, where discovery is complete and Williams has had access to Bally's machine for some months, we think it reasonable for Williams to produce the result of some test or other fact that indicates that problems with *Rapid Fire*'s hopper unit are recurrent.[26] The

fact that on one occasion a single unit of *Rapid Fire* had a problem with its hopper unit hardly demonstrates that, in general, the game's hopper unit has a propensity to jam.[27]

■ Second, Williams relies on an affidavit which states that *Rapid Fire*'s gun cannot fire ten balls per second even if the hopper unit could feed them at that rate. However, this does not indicate that Bally's representation was false; Bally made no claims as to the speed at which its gun could fire. In any event, the affiant states no underlying facts on which this conclusion is based, such as a test performed on *Rapid Fire.* Neither does the affiant establish his expertise in this area. Thus, Williams' affidavit fails to set forth specific facts that would be admissible in evidence as required by Fed.R.Civ.P. 56(e).

Because Williams has failed to set forth in any specific way the evidence of falsity or deceptiveness in the Bally memo's description of its ball feeder mechanism, it has

the act. Here, however, the memo was shown to Bally's distributors, presumably to assist them in marketing *Rapid Fire.* Thus, the memo provided information that could influence purchasing decisions, unlike a user's manual, which is distributed only after the product is bought. Since the memo was shown to persons who would use it to influence purchasing decisions, it is covered by the Lanham Act. *See N.S. Meyer, Inc. v. Ira Green, Inc.,* 326 F.Supp. 338, 343–44 (S.D.N.Y.1971).

25. Two points are worth noting. First, the unit that Williams' employees saw jam at the trade show was a prototype and not the same model that Bally's distributors were to market based on the claim in the memo. Williams produces no evidence that the model Bally marketed in interstate commerce *ever* jammed. Second, one of the employees admitted at his deposition that he did not know whether it was the hopper unit that jammed at the trade show or whether the problem was with something else. He only claimed that it was the hopper unit that jammed because an engineer told him so. Williams has not produced an affidavit from the engineer. Thus, at least one of the employees' testimony may be inadmissible under Fed.R. Evid. 801–02, at least with respect to the cause of the observed jamming.

26. Discovery has closed in this case as of January 17, 1983. Moreover, Williams has not requested additional discovery to enable it to obtain evidence concerning the operation of *Rapid Fire*'s hopper unit. Thus, we assume that the two employees' testimony is all that Williams will be able to adduce on this point at trial.

27. Indeed, in itself this evidence is probably inadmissible. To use a pertinent analogy, evidence that a person acted in a given way on a specific occasion is not admissible to prove that he tends to act the same way on other occasions. Fed.R.Evid. 404(b). Only when the person's behavior is so recurrent as to rise to the level of habit is it relevant to prove that the behavior occurs on more than isolated occasions. *See id.* 406. The key question is whether the proponent of the evidence has a sufficiently large number of instances to establish a pattern of systematic conduct that amounts to a habit. *See Strauss v. Douglas Aircraft Co.,* 404 F.2d 1152, 1158 (2d Cir.1968). Here, Williams is attempting to prove that *Rapid Fire* has a propensity for jamming but has forwarded only one example of jamming. That is insufficient to raise the required inference of systematic jamming.

failed to raise an issue of fact on this point.[28]

▆ The next three specific representations that Williams alleges are false are that *Rapid Fire* uses 100 percent opto switches on all targets which avoids use of unreliable micro switches that are difficult to adjust; that *Rapid Fire* avoids having balls collide with each other due to greater drainage area; and that the barrel on *Rapid Fire*'s cannon is easier to aim than that on *Hyperball.* Williams has filed affidavits indicating that these representations are false and/or deceptive; Bally has filed affidavits indicating that they are true. An issue of fact exists as to the truth of these statements.

▆ The fifth and final representation on which Williams relies consists of a set of unattributed quotations appended to the Bally memo which Williams claims are false and deceptive.[29] Neither side has submitted any affidavits or other evidentiary materials with respect to these quotations. Thus, neither side has supported its position in the manner required by Fed.R.Civ.P. 56(e). Hence, summary judgment with respect to their truth would be premature.

▆ With respect to the second and third elements of Williams' Lanham Act claim, Bally has submitted evidentiary material indicating that the memo was shown to only 20 distributors,[30] and that distributors are rather sophisticated purchasers who do not make their purchasing decisions solely on the basis of promotional materials. But that is not the same as saying that the

distributors do not rely on promotional material at all, and Williams' burden is not to show that the purchasers relied solely on the false representation, but only that representation had a *tendency* to deceive and was *likely* to influence purchasers. *See* pp. 1282–1283, *supra.* Moreover, even if this material did not influence the distributors, once they decided to distribute *Rapid Fire* they may have used what they learned in the memo to influence their distributees, the ultimate purchasers, who may lack the distributors' sophistication. There is an issue of fact on this point.

On the fourth element of Williams' claim, Bally argues that the memo dealt with an early model of *Rapid Fire* that was never marketed in interstate commerce. However, Bally does not show that it was ever made clear that the representations in the memo applied only to the early model, or that the distributors did not assume that the lofty claims made in the memo with respect to the earlier model were not also true of the later, presumably more advanced model that did enter interstate commerce. If the allegedly false representations in the memo did infect the subsequent marketing of the later model in interstate commerce, Williams will make out a Lanham Act claim. Since the parties have not submitted affidavits on this issue, summary judgment cannot be granted on it.[31]

In sum, there are issues of fact which preclude summary judgment as to four of the five specific representations on which Williams bases its Lanham Act claim.[32] We are constrained to observe, however, that

---

**28.** Williams acknowledges that it has the burden of producing evidence that Bally's representations were false. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 20.

**29.** A sampling of the quotes follows: "This is like a video game./ I like the feel of *your* handles./ Arcades will definitely bank a game like this./ You can't take your eyes off it for a second ... it's great!" (emphasis and ellipsis in original).

**30.** The fact that only 6 of these distributors also handle Williams' products is irrelevant. Distributors are no more than middlemen who

resell the games. Thus, Bally's distributors may have used the material in the memo to induce the ultimate purchasers to buy *Rapid Fire* instead of *Hyperball* or some other of Williams' products.

**31.** Bally does not contend that it is entitled to summary judgment on the fifth element, actual injury, of Williams' Lanham Act claim.

**32.** For the same reasons that we have denied Bally summary judgment on the Lanham Act claim, it is also not entitled to judgment on Williams' state law claims. Issues of fact remain as to the falsity and effect of the representations at issue.

the entire Lanham Act claim (and its state counterparts) are much ado about nothing. In this era when, we are told, district courts are drowning in a sea of frivolous civil rights litigation (an allegation with which we disagree) we hope that responsible counsel in the field of intellectual property would save us from frivolity in their field of expertise.

Defendant's motion for summary judgment is granted in part and denied in part. Judgment will enter in favor of defendant on plaintiff's copyright claim after all other claims and defenses have been finally adjudicated. Final pretrial materials, pretrial conference and trial in accordance with schedule entered this date.